**INVESTMENT COMPANY INSTITUTE, Petitioner,**

**v.**

**BOARD OF GOVERNORS OF the FEDERAL RESERVE SYSTEM, Respondent.**

**No. 77–1862.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 18, 1978.

Decided March 30, 1979.

Rehearing Denied July 16, 1979.

G. Duane Vieth, Washington, D. C., with whom Paul S. Ryerson, Washington, D. C., was on the brief, for petitioner.

Richard M. Ashton, Atty., Board of Governors of the Federal Reserve System, Washington, D. C., a member of the bar of the Court of Appeals of Maryland pro hac vice by special leave of the Court with whom Barbara Allen Babcock, Asst. Atty. Gen. and Ronald R. Glancz, Atty., Dept. of Justice, Washington, D. C., were on the brief, for respondent.

James W. Jones, Washington, D. C., entered an appearance for petitioner.

Robert Kaplan, Atty., Dept. of Justice, Washington, D. C., entered an appearance for respondent.

Before McGOWAN and WILKEY, Circuit Judges, and GASCH,* United States District Judge for the District of Columbia.

Opinion for the court filed by McGOWAN, Circuit Judge.

McGOWAN, Circuit Judge:

This direct review proceeding raises the question of whether federal banking legislation prohibits bank holding companies or their non-bank subsidiaries from acting as investment advisers to closed-end investment companies. Respondent Board of Governors of the Federal Reserve System (the Board) promulgated a regulation and accompanying interpretive ruling purporting to authorize such activity. Petitioner, a national association of mutual funds,[1] charged, both in the administrative proceedings and before this court, that the Board's action is (1) inconsistent with sections 16 and 21 of the Banking Act of 1933, 12 U.S.C. §§ 24 (Seventh), 378 (Glass-Steagall Act);[2] and (2) unauthorized by section 4(c)(8) of the Bank Holding Company Act of 1956.[3]

While we disagree with petitioner's argument as to the effect of the Glass-Steagall Act, our independent review of federal banking legislation convinces us that petitioner is entitled to relief under the Bank Holding Company Act. Because the statutory considerations that we have identified are somewhat different from those articulated by petitioner during the administrative proceedings, the Board was not pressed in those proceedings to develop at any length its views on these questions. However, although we normally pay considerable deference to the Board's interpretation

---

* Sitting by designation pursuant to 28 U.S.C. § 292(a).

1. In a memorandum to the Board submitted September 23, 1971, petitioner described itself as "an association of 356 open-end investment companies, their 159 investment advisers, and 120 principal underwriters. These members, which include both 'load' and 'no load' funds, represent about 93 percent of the assets of all such companies in the United States." Joint Appendix (JA) at A–4 n. *.

2. The Glass-Steagall Act is codified at various places in Title 12 of the United States Code.

3. 12 U.S.C. §§ 1841 et seq.

of its organic statutes, *Board of Governors v. First Lincolnwood Corp.,* 439 U.S. 234, 248, 99 S.Ct. 505, 513, 58 L.Ed.2d 484 (1978), we think it unnecessary in the present case to remand to the Board for further evaluation of the considerations we have here identified. For we find that the statutory materials—which are as accessible to this court as they are to the Board—compel the result we reach herein; and we vacate the regulation and interpretive ruling under review.

I

Section 4(a) of the Bank Holding Company Act, 12 U.S.C. § 1843(a), generally prohibits bank holding companies, *i. e.,* companies that own or control one or more commercial banks,[4] from engaging in non-banking activities either directly or through a subsidiary company. However, section 4(c)(8) of the Act, 12 U.S.C. § 1843(c)(8), exempts from this prohibition subsidiaries whose activities are "so closely related to banking or managing or controlling banks as to be a proper incident thereto."[5] Bank holding companies are permitted to engage directly in activities authorized for subsidiaries by section 4(c)(8) by virtue of section 4(a)(2)(B) of the Act, 12 U.S.C. § 1843(a)(2)(B). The Board, acting pursuant to authority delegated in section 4(c)(8), has heretofore identified a number of activities as "closely related to banking," and therefore permitted to bank holding companies and their non-bank subsidiaries, in its Regulation Y, 12 C.F.R. § 225.4.

On August 12, 1971, the Board issued notice of a proposed amendment to Regulation Y[6] authorizing bank holding companies and their non-bank subsidiaries to serve as investment advisers to any investment company registered under the Investment Company Act of 1940, 15 U.S.C. §§ 80a–1 *et seq.* An investment company is a corporation or trust whose business is the investment and reinvestment of the pool of funds contributed by its shareholders. *See* section 3(a) of the Investment Company Act, 15 U.S.C. § 80a–3(a). An investment adviser is a company that, in addition to rendering investment advice, typically organizes, manages and controls an affiliated investment company.[7]

The Board received numerous written comments on its proposal and, at the request of petitioner herein, held a public hearing in which petitioner and other par-

---

**4.** *See* § 2(a) of the Act, *as amended,* 12 U.S.C. § 1841(a).

**5.** Section 4(c)(8), *as amended,* provides that § 4's prohibitions shall not apply to

"shares of any company the activities of which the Board after due notice and opportunity for hearing has determined (by order or regulation) to be so closely related to banking or managing or controlling banks as to be a proper incident thereto. In determining whether a particular activity is a proper incident to banking or managing or controlling banks the Board shall consider whether its performance by an affiliate of a holding company can reasonably be expected to produce benefits to the public, such as greater convenience, increased competition, or gains in efficiency, that outweigh possible adverse effects, such as undue concentration of resources, decreased or unfair competition, conflicts of interests, or unsound banking practices. In orders and regulations under this subsection, the Board may differentiate between activities commenced de novo and activities commenced by the acquisition, in whole or in part, of a going concern. . . . ."

**6.** 36 Fed.Reg. 16695 (1971), corrected, 36 Fed. Reg. 17514 (1971).

**7.** One authority has characterized the investment company industry as follows:

Although a few mutual funds are managed along conventional corporate lines by their own officers and directors, most of them are formed, promoted, and managed by external organizations that are separately owned and operated. These separate organizations are usually designated as "investment advisers." The advisers select the funds' investments and operate or supervise most other aspects of their business. In return for their services they receive an advisory fee. The fee is almost always a percentage of the value of the fund's net assets fluctuating upward or downward as the value of the portfolio changes.

Securities and Exchange Comm'n, *Public Policy Implications of Investment Company Growth,* H.R.Rep.No.2337, 89th Cong., 2d Sess. 8–9 (1966) (footnote deleted). *Accord,* S.Rep. No.184, 91st Cong., 1st Sess. 5 (1969); U.S. Code Cong. & Admin.News 1970, p. 4897.

ties presented further views. On January 28, 1972, the Board adopted the proposed regulation with certain minor clarifications. 12 C.F.R. § 225.4(a)(5)(ii), 37 Fed.Reg. 1463 (1972). As amended, the regulation provides in pertinent part:

> (a) *Activities closely related to banking or managing or controlling banks.* . . . The following activities have been determined by the Board to be so closely related to banking or managing or controlling banks as to be a proper incident thereto:
>
> . . .
>
> (5) . . . (ii) serving as investment adviser, as defined in section 2(a)(20) of the Investment Company Act of 1940, to an investment company registered under that Act . . . . .

The Board apparently intended, when it proposed this regulation, that it would apply equally to the two main varieties of investment companies, closed-end and open-end.[8] An open-end company (also commonly called a "mutual fund") is continuously engaged in issuing its shares and stands ready at any time to redeem them; a closed-end company typically does not issue shares after its initial offering except at infrequent intervals, and does not stand ready to redeem them. 12 C.F.R. § 225.125(c), 37 Fed.Reg. 1464 (1972).[9] During the course of the administrative proceedings, however, several participants, including petitioner herein[10] and the Department of Justice,[11] objected to permitting bank holding companies or their subsidiaries to advise *open-end* investment companies.

In response to these comments, the Board supplemented its regulation with a simultaneously issued interpretive ruling. 12 C.F.R. § 225.125, 37 Fed.Reg. 1464 (1972). The Board concluded that the provisions of the Glass-Steagall Act, particularly as interpreted by the Supreme Court in *Investment Company Institute v. Camp*, 401 U.S. 617, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971),[12] prohibited bank holding companies from sponsoring, organizing, or controlling (hereinafter, "operating") *open-end* investment companies. 12 C.F.R. § 225.125(f).[13] Be-

---

**8.** Both of these are considered "management companies" under section 4 of the Investment Company Act, 15 U.S.C. § 80a–4. That section recognizes two other types of investment companies, "face amount certificate companies" and "unit investment trusts". *Id.* These are infrequently encountered and are not relevant to the instant case.

**9.** *Compare* § 5(a)(1) of the Investment Company Act, 15 U.S.C. § 80a–5(a)(1) *with* § 5(a)(2) of the Act, 15 U.S.C. § 80a–5(a)(2). Shares in an open-end company are continuously bought from and sold to the company itself, while shares in a closed-end company, after the initial issuance, are typically bought and sold on the open market.

**10.** JA at A–4, A–26.

**11.** Record at 86–97. The Department of Justice lauded the "pro-competitive" aspects of the proposal, but warned the Board that the limitations imposed by § 20 of the Glass-Steagall Act, 12 U.S.C. § 377, might prohibit bank holding companies from offering adviser services to mutual funds.

**12.** The *Camp* case held that sections 16 and 21 of the Glass-Steagall Act prohibited a national bank from selling interests in a "commingled investment account"—the functional equivalent of an open-end investment company. The fund at issue in *Camp* was apparently not set up as a separate corporation from the bank itself. Petitioner argued to the Board that, because of the dominance usually exerted over the fund by the adviser, *see* note 7 and accompanying text, *supra,* the reasoning of the *Camp* case was equally applicable in the more common situation in which the fund and its adviser were separate corporate entities. The Board implicitly accepted this argument. 12 C.F.R. §§ 225.125(e), (f).

**13.** The Board found, however, that bank holding companies could act as investment advisers to mutual funds so long as they did not sponsor, organize or control them. *See* 12 C.F.R. §§ 225.125(d), (e), (f). This would appear tantamount to a finding that bank holding companies may at least render *advice* to an affiliated mutual fund. Petitioner challenged even this limited authorization before the Board, *see* JA at A–13–16, but has not renewed that argument on judicial review, apparently because its objections were satisfied by certain additional safeguards provided by the Board in its interpretive ruling, *see* note 14 and accompanying text *infra.* Under these circumstances, we do not reach, and are not to be taken as expressing any view on, the question of whether bank holding companies and their non-bank subsidiaries may, either under the present regulation or one more narrowly drawn, render solely

cause of their lower level of securities activity, however, *see* note 9 and accompanying text *supra,* the Board found that *closed-end* investment companies are not subject to these prohibitions "so long as [they] are not primarily or frequently engaged in the issuance, sale, and distribution of securities." 12 C.F.R. § 225.125(f).

The interpretive ruling imposed a number of other restrictions on investment advisory activities by bank holding companies. These limitations were designed, generally, to prevent association in the public mind of the investment company and the bank holding company, *see* 12 C.F.R. §§ 225.125(f), (h); to forbid the bank holding company's subsidiary bank from extending credit to the investment company, purchasing, selling or distributing its shares, or accepting its securities as collateral for a loan to purchase other of its securities, *see* 12 C.F.R. §§ 225.125(g), (h); and to prohibit unfair sales practices directed toward customers of the bank subsidiary, *see* 12 C.F.R. § 225.125(h).[14]

After an initial jurisdictional misstep,[15] petitioner brought this challenge to an or-

---

investment advice to closed-end investment companies, as distinct from sponsoring, organizing, managing, or controlling such companies.

**14.** The relevant portions of the interpretive ruling are as follows:

(f) In the Board's opinion, the Glass-Steagall Act provisions, as interpreted by the U.S. Supreme Court, forbid a bank holding company to sponsor, organize or control a mutual fund. However, the Board does not believe that such restrictions apply to closed-end investment companies as long as such companies are not primarily or frequently engaged in the issuance, sale and distribution of securities. In no case, however, should a bank holding company act as investment adviser to an investment company which has a name that is similar to, or a variation of, the name of the holding company or any of its subsidiary banks.

(g) In view of the potential conflicts of interests that may exist, a bank holding company and its bank and nonbank subsidiaries should not (1) purchase for their own account securities of any investment company for which the bank holding company acts as investment adviser; (2) purchase in their sole discretion, any such securities in a fiduciary capacity (including as managing agent); (3) extend credit to any such investment company; or (4) accept the securities of any such investment company as collateral for a loan which is for the purpose of purchasing securities of the investment company.

(h) A bank holding company should not engage, directly or indirectly, in the sale or distribution of securities of any investment company for which it acts as investment adviser. Prospectuses or sales literature should not be distributed by the holding company, nor should any such literature be made available to the public at any offices of the holding company. In addition, officers and employees of bank subsidiaries should be instructed not to express any opinion with respect to advisability of purchase of securities of any investment company for which the bank holding company acts as investment adviser. Customers of banks in a bank holding company system who request information on an unsolicited basis regarding any investment company for which the bank holding company acts as investment adviser may be furnished the name and address of the fund and its underwriter or distributing company, but the names of bank customers should not be furnished by the bank holding company to the fund or its distributor. Further, a bank holding company should not act as investment adviser to a mutual fund which has offices in any building which is likely to be identified in the public's mind with the bank holding company.

(i) Acting in such capacities as registrar, transfer agent, or custodian for an investment company is not a selling activity and is permitted under § 225.4(a)(4) of Regulation Y. However, in view of potential conflicts of interests, a bank holding company which acts both as custodian and investment adviser for an investment company should exercise care to maintain at a minimal level demand deposit accounts of the investment company which are placed with a bank affiliate and should not invest cash funds of the investment company in time deposit accounts (including certificates of deposit) of any bank affiliate.

**15.** Petitioner, after the Board denied its petition for reconsideration and rescission, originally brought suit in the District Court requesting an injunction and a declaratory judgment that the challenged action was unlawful. The District Court dismissed the complaint on the ground that the sole forum for judicial review was the Court of Appeals. *Investment Co. Inst. v. Board of Governors,* 398 F.Supp. 725 (D.D.C. 1975). This court upheld the District Court's ruling. *Investment Co. Inst. v. Board of Governors,* 179 U.S.App.D.C. 311, 551 F.2d 1270 (1977). Petitioner thereupon filed a second petition for reconsideration and rescission which the Board once again denied. Order Rejecting Petition of Investment Company Institute for

der of the Board rejecting its petition for reconsideration and rescission of 12 C.F.R. § 225.4(a)(5)(ii).[16] The case presents a variation on a recurring theme in modern banking law: the tension between federal regulatory statutes designed in part to limit bank activities, and attempts by banks—often sanctioned by federal banking authorities—to compete in broader lines of business.[17] To our knowledge, it is the first case in which a court has been asked to determine the permissibility of activities in the *securities* area by bank holding companies and their non-bank subsidiaries.

## II

Respondent argues, as a threshold matter, that petitioner lacks standing to bring this suit. In the field of banking legislation, however, Congress has evidenced its concern to give broad rights of judicial review to parties alleging competitive injury as a result of decisions by federal banking authorities. Thus, the Supreme Court has found standing in parties challenging regulations by the Comptroller of the Currency authorizing national banks to enter into competitive lines of business. *Investment Company Institute v. Camp*, 401 U.S. 617, 620–21, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971); *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 152–56, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).

The same congressional concern to grant rights of judicial review to competitors is present when challenge is made to a decision of the Federal Reserve's Board of Governors. Section 9 of the Bank Holding Company Act provides that "[a]ny party aggrieved by an order of the Board" is entitled to judicial review thereof. 12 U.S.C. § 1848. Congress unambiguously demonstrated its intent that standing be liberally granted in a 1970 amendment to the Act that further defined the class of parties aggrieved to include those who would become competitors as a result of a bank holding company's entering a nonbanking business pursuant to order of the Board. 12 U.S.C. § 1850. As noted in the Conference Committee Report to the 1970 Amendments, the purpose of this provision is to guarantee a "properly liberal attitude concerning the right of competitors of banks and bank holding companies to have standing" such that "the broadest possible forum [is] allowed for adversary proceedings to take place in order that all issues may be aired completely." H.R.Rep.No. 1747, 91st Cong., 2d Sess. 29, 30 (1970); U.S.Code Cong. & Admin.News 1970, pp.

Reconsideration and Recision [*sic*] of a Regulation by the Board, 12 C.F.R. § 225.4(a)(5)(ii), effective August 31, 1977, JA at A–169. It is this order that is under review in the present proceeding.

**16.** The case has been the subject of considerable scholarly interest. *See, e. g.*, R. Jennings & H. Marsh, Securities Regulation 1351–52 (4th ed. 1977); J. White, Banking Law 375–82 (1976).

**17.** Aided by a series of liberal interpretations by the Comptroller of the Currency, national banks sought in the 1960's to expand the range of their activities in-house. These efforts, however, were largely undone by various court rulings restrictively interpreting the powers of national banks under the National Bank Act. *See, e. g., Investment Co. Inst. v. Camp*, 401 U.S. 617, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971); *First Nat'l Bank v. Dickinson*, 396 U.S. 122, 90 S.Ct. 337, 24 L.Ed.2d 312 (1969); *Arnold Tours, Inc. v. Camp*, 472 F.2d 427 (1st Cir. 1972); *National Retailers Corp. v. Valley Nat'l Bank*, 411 F.Supp. 308 (D.Ariz.1976); *Georgia Ass'n*

of *Indep. Ins. Agents, Inc. v. Saxon*, 268 F.Supp. 236 (N.D.Ga.1967), *aff'd*, 399 F.2d 1010 (5th Cir. 1968); *Baker, Watts & Co. v. Saxon*, 261 F.Supp. 247 (D.D.C.1966), *aff'd sub nom. Port of New York Auth. v. Baker, Watts & Co.*, 129 U.S.App.D.C. 173, 392 F.2d 497 (1968). *But see M & M Leasing Corp. v. Seattle First Nat'l Bank*, 563 F.2d 1377 (9th Cir. 1977), *cert. denied*, 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978). Banks have more recently turned to the holding company device, seeking to expand by means of non-bank subsidiaries of the holding company into new fields such as insurance, *Alabama Ass'n of Ins. Agents v. Board of Governors*, 533 F.2d 224 (5th Cir. 1976), *modified on other grounds*, 558 F.2d 729 (5th Cir. 1977), *cert. denied*, 435 U.S. 904, 98 S.Ct. 1448, 55 L.Ed.2d 494 (1978), courier services, *National Courier Ass'n v. Board of Governors*, 170 U.S.App.D.C. 301, 516 F.2d 1229 (1975), or travel agencies, *Association of Bank Travel Bureaus, Inc. v. Board of Governors*, 568 F.2d 549 (7th Cir. 1978). *See* J. White, *supra* note 16, at 299.

5519, 5580–81 [hereinafter cited as 1970 Conf.Rep.].

We have no doubt that, in the context of such strongly expressed congressional intent, the irreducible constitutional minima in the standing doctrine are satisfied in this case. It is settled that an organization has standing to sue on behalf of its injured members. *Warth v. Seldin*, 422 U.S. 490, 511, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Sierra Club v. Morton*, 405 U.S. 727, 734–41, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). Petitioner alleged before the District Court, in an earlier stage of this controversy, *see* note 15 *supra*, that the Board's regulation

> will subject the Institute's investment company members to illegal competition, will deprive them of legitimate business, and will dilute, divert and withdraw a substantial portion of the potential market for securities of investment companies to the substantial and irreparable injury of such members of the Institute and their shareholders. . . .

JA at A–78. Moreover, the injuries alleged are not merely "speculative," *see Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 42, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976). Petitioner alleges that, as a result of § 225.4(a)(5)(ii), many bank holding companies or their subsidiaries are actively engaged in the operation of closed-end investment companies to the detriment of its members. We conclude, then, that petitioner has standing to bring this action.

### III

### A.

Petitioner first argues that the Board's order and interpretive ruling authorize conduct in violation of section 21 of the Glass-Steagall Act, *as amended*, 12 U.S.C. § 378. Section 21 provides, in pertinent part, that it is unlawful

> For any person, firm, corporation, association, business trust, or other similar organization, engaged in the business of issuing, underwriting, selling, or distributing, at wholesale or retail, or through syndicate participation, stocks, bonds, debentures, notes, or other securities, to engage at the same time to any extent whatever in the business of receiving deposits subject to check or to repayment upon presentation of a passbook, certificate of deposit, or other evidence of debt, or upon request of the depositor. . . .

Petitioner bases its argument largely on *Investment Company Institute v. Camp, supra.* It contends that although *Camp* involved a *national bank's* operation of an *open-end* company, that case's analysis of section 21 is equally applicable to a *bank holding company's* operation of a *closed-end* company.

The Board, for its part, counters with two somewhat inconsistent contentions. First, it observes that while open-end companies are continuously buying and selling their shares, closed-end companies typically issue their shares only in their initial offering and at infrequent intervals thereafter. It notes that even closed-end companies are not within the regulation if they are "primarily or frequently" engaged in the issuance, sale and distribution of securities, 12 C.F.R. § 225.125(f), and notes further that the interpretive ruling prohibits a bank holding company from any involvement in the public sale or distribution of the securities. 12 C.F.R. § 225.125(h). Stated in statutory terms, the Board's first argument is that an investment adviser may, under the limitations contained in its interpretive ruling, operate a closed-end company without engaging in the "*business* of issuing, underwriting, selling, or distributing" the securities of that company. Although the Board's argument in this regard appears at least superficially plausible, we need not decide here whether the weight it gives the distinction between closed- and open-end companies is rationally based in the evidence of record, or whether its interpretation of section 21 of the Act, as applied to these facts, is sustainable in light of the deference owed to the Board's construction of federal banking statutes. For we find a clearer ground of decision in the Board's second argument.

This second argument is based both on the literal language of section 21 and on the structure of the Glass-Steagall Act as a whole. Section 21 in terms applies only to entities that are "engaged in the [securities] business" *and* "engage[d] at the same time to any extent whatever" in the commercial banking business. The Board contends that, even if a closed-end fund's investment adviser is engaged in the securities business, it is not subject to section 21 because it performs no commercial banking functions.[18]

Petitioner's response is that other subsidiaries of the bank holding company *are* engaged in commercial banking, and that in view of the Glass-Steagall Act's "prophylactic" goal, *ICI v. Camp, supra,* 401 U.S. at 639, 91 S.Ct. 1091, of separating investment from commercial banking, all elements in the bank holding company structure should be considered a "single entity" for purposes of section 21. Stated another way, petitioner's argument is that the holding company and all of its subsidiaries fall within the terms of "any person, firm, corporation, association, business trust, or other similar organization" subject to section 21.

While we agree that the purposes of the Glass-Steagall Act are fully broad enough to encompass the activities of bank holding companies and their non-bank subsidiaries, *see* text accompanying note 31 *infra,* these broad purposes fail to advance petitioner's argument. The list of entities subject to section 21 conspicuously omits reference to distinct corporations related by ownership interests, and it is unlikely that Congress intended the inclusive phrase "other *similar* organization" to extend this far.

This inference is powerfully supported by the structure of the Glass-Steagall Act, which as originally enacted divided bank-related activities into three categories. First, Congress prohibited any organization from engaging *in-house* in both commercial banking and securities activities. In this category fell section 21, which was designed to prohibit the great investment banking houses from engaging in deposit banking.[19] Second, Congress sought to divorce commercial banks from affiliated securities firms. Ownership or control of securities affiliates was forbidden to national banks and state banks that were members of the Federal Reserve System (state member banks) by section 20 of the Act, 48 Stat. 188, *codified as amended,* 12 U.S.C. § 377.[20]

18. This argument would appear somewhat inconsistent with the previous one, and with the Board's interpretive ruling, because if the argument is accepted the Board would have no need to distinguish closed- and open-end companies. That is, if bank holding companies are not "engaged in" commercial banking, then it would be perfectly permissible, under section 21, for a bank holding company to operate an open-end investment company—activity that the Board has concluded would violate the Glass-Steagall Act. We do not think, however, that the Board's interpretive ruling is irrational because of this fact. Given the vagaries of judicial review, the Board was entitled to shape its action to insure against judicial reversal even if in doing so it adopted somewhat inconsistent positions.

19. That Section 21 was intended to apply to in-house activities only is clear from the following colloquy between Senator Glass, co-sponsor of the bill, and Senator Robinson:

> Sen. Glass: . . . .. Here we prohibit the large private banks, whose chief business is investment business, from receiving deposits.

> We separate them from the deposit banking business.

> . . . . .

> Sen. Robinson: *That means if they wish to receive deposits they must have separate institutions for that purpose?*
> Sen. Glass: *Yes.*

77 Cong.Rec. 3730 (1933) (emphasis supplied). *See also id.* at 4180 (remarks of Sen. Bulkley).

Also falling in this category is § 16 of the Act, *set forth* at text accompanying note 23 *infra.* Section 16 was designed to deal with the converse situation from § 21: while § 21 prohibited investment banks from engaging in commercial banking, § 16 prohibited commercial banks subject to the Act from carrying on securities activities.

20. As enacted, § 20 provided in pertinent part that

> no member bank shall be affiliated in any manner described in section 2(b) hereof with any corporation, association, business trust, or other similar organization engaged principally in the issue, flotation, underwriting, public sale, or distribution at wholesale or retail or through syndicate participation of

Interlocking managements between national or state member banks and securities firms were forbidden by section 32 of the Act, 48 Stat. 194, *codified as amended*, 12 U.S.C. § 78 (1976).[21] Third, Congress sought to divorce as far as possible bank holding companies from their subsidiaries which carried on securities activities. These securities subsidiaries were forbidden, under section 19(e) of the Act, 48 Stat. 188, *repealed in pertinent part*, 80 Stat. 242–43, to any bank holding company that wished to vote its shares of a national or state member bank.[22]

This tripartite structure, in our view, is convincing evidence that Congress rejected a "single entity" theory in favor of a more discriminating approach to the problem. *See also Board of Governors v. Ag-new*, 329 U.S. 441, 448, 62 S.Ct. 411, 91 L.Ed. 408 (1947). Congress, in the Glass-Steagall Act, did indeed intend to regulate the activities of bank holding companies and their non-bank subsidiaries—but *not* in section 21 of the Act. Because we conclude that section 21 was intended to apply to in-house activities only, we find that it is not violated by the Board's regulation and interpretive ruling challenged herein.

**B.**

Petitioner challenges the Board's action, alternatively, as being inconsistent with section 16 of the Glass-Steagall Act, *as amended*, 12 U.S.C. § 24 (Seventh). Section 16 provides in pertinent part that

The business of dealing in securities and stock by [a national bank] shall be limited

---

stocks, bonds, debentures, notes, or other securities.

Section 2(b) of the Act, 48 Stat. 162, *codified at* 12 U.S.C. § 221a, defined "affiliate" to include any corporation, business trust, association, or other similar organization—

(1) Of which a member bank, directly or indirectly, owns or controls either a majority of the voting shares or more than 50 per centum of the number of shares voted for the election of its directors, trustees, or other persons exercising similar functions at the preceding election, or controls in any manner the election of a majority of its directors, trustees, or other persons exercising similar functions; or

(2) Of which control is held, directly or indirectly, through stock ownership or in any other manner, by the shareholders of a member bank who own or control either a majority of the shares of such bank or more than 50 per centum of the number of shares voted for the election of directors of such bank at the preceding election, or by trustees for the benefit of the shareholders of any such bank; or

(3) of which a majority of its directors, trustees, or other persons exercising similar function are directors of any one member bank.

21. As enacted, § 32 provided in pertinent part that

no officer or director of any member bank shall be an officer, director, or manager of any corporation, partnership, or unincorporated association engaged primarily in the business of purchasing, selling, or negotiating securities. . . .

48 Stat. 194.

The coverage of § 20 and § 32 was, and is, not perfectly congruent; while § 20 applies to affiliates "engaged principally" in the invest-ment business, the coverage of § 32 is somewhat broader and extends to entities "engaged primarily" in securities dealings. *Board of Governors v. Agnew*, 329 U.S. 441, 448, 67 S.Ct. 411, 91 L.Ed. 408 (1947).

22. Section 19(e) provided that holding company affiliates could not vote their shares unless they agreed not to own, control, or have any interest in a "securities company," defined as

any corporation, business trust, association or other similar organization formed for the purpose of, or engaged principally in, the issue, flotation, underwriting, public sale, or distribution, at wholesale or retail or through syndicate participation, of stocks, bonds, debentures, notes, or other securities of any sort . . . .

48 Stat. 188. This provision was made applicable to state member banks by § 5 of the Act, 48 Stat. 166, *repealed*, 80 Stat. 243.

"Holding company affiliate" was defined to include

any corporation, business trust, association, or other similar organization—

(1) Which owns or controls, directly or indirectly, either a majority of the shares of capital stock of a member bank or more than 50 per centum of the number of shares voted for the election of directors of any one bank at the preceding election, or controls in any manner the election of a majority of the directors of any one bank; or

(2) For the benefit of whose shareholders or members all or substantially all the capital stock of a member bank is held by trustees.

Section 2(c) of the Act, 48 Stat. 163, *repealed*, 80 Stat. 242. *Compare* the definition of "affiliate" in note 20 *supra*.

to purchasing and selling such securities and stock without recourse, solely upon the order, and for the account of, customers, and in no case for its own account, and [a national bank] shall not underwrite any issue of securities or stock . . . . Except as hereinafter provided or otherwise permitted by law, nothing herein contained shall authorize the purchase by [a national bank] for its own account of any shares of stock of any corporation.[23]

As to this section, petitioner concedes that only the activities of banks and not those of other entities within the holding company structure, are within its terms. It argues, however, that national and state member banks are authorized to act as investment advisers by the following statement in the Board's interpretive ruling:

Under § 225.5(a)(5), as amended, bank holding companies (*which term, as used herein, includes both their bank and nonbank subsidiaries*) may, in accordance with the provisions of § 225.4(b), act as investment advisers to various types of investment companies. . . . .

12 C.F.R. § 225.125(c) (emphasis added). Such activity by national and state member banks, in petitioner's view, is directly forbidden by section 16.[24]

The Board, however, disclaims any intention of authorizing banks, as opposed to bank holding companies and their non-bank subsidiaries, to act as investment advisers. It notes that its interpretive ruling was issued pursuant to section 4(c)(8) of the Bank Holding Company Act, which authorizes activity only by bank holding companies themselves [25] or their non-bank subsidi-

aries. Therefore, says the Board, it did not and could not permit *banks* to engage in investment adviser activities. The reference to bank subsidiaries in the interpretive ruling, according to the Board, was designed to impose only the *restrictions* of that ruling, *see* note 14 and accompanying text *supra*, on subsidiary banks.[26]

Although the Board's explanation of the interpretive ruling is reasonable, it is nevertheless true that the ruling is highly susceptible to the construction urged by petitioner. While that ruling has been published in the Federal Register and the Code of Federal Regulations, the Board's disclaimer has, so far as we know, been circulated only to petitioner, J.A. at A–68, and to other persons who may have had occasion to read that letter or the Board's brief in this review proceeding. The publication of this opinion should serve to bring to wider public attention the Board's interpretation of the reference to bank subsidiaries in 12 C.F.R. § 225.125(c).

IV

This is, however, not the end of our inquiry. The operative phrase we are called upon to interpret is not found in the Glass-Steagall Act but rather in the Bank Holding Company Act, as amended; the precise issue before us is whether operating a closed-end investment company, under the terms of the Board's regulation and interpretive ruling, is "so closely related to banking or managing or controlling banks as to be a proper incident thereto." Section 4(c)(8) of the Bank Holding Company Act, *as amended*, 12 U.S.C. § 1843(c)(8). The Glass-Steagall Act is not dispositive of this

23. These limitations are made applicable to state member banks by § 5(c) of the Glass-Steagall Act, 12 U.S.C. § 335.

24. Petitioner claims that, in reliance on this ruling, numerous national and state member banks are now acting as investment advisers to closed-end investment companies.

25. *See* § 4(a)(2)(B) of the Bank Holding Company Act, 12 U.S.C. § 1843(a)(2)(B).

26. The Board disputes petitioner's claim that banks have initiated investment adviser serv-

ices in reliance on the Board's action, *see* note 24 *supra*. It notes that *if* banks had actually initiated such services in reliance on Regulation Y, they would have had to apply to the Board for specific approval prior to offering the service. *See, e. g., National Courier Ass'n v. Board of Governors*, 170 U.S.App.D.C. 301, 516 F.2d 1229 (1975). According to the board it has not received a single application for permission for a bank to engage in investment adviser services.

question, for even if it is not violated directly, it remains possible that the Bank Holding Company Act has been contravened. At the same time, of course, the Glass-Steagall Act is not irrelevant to this inquiry; its policies may well carry forward and inform the meaning of the later statute.

 We are bound to note that the Board was never forcefully presented with this argument. Petitioner did allege before the Board and at oral argument before us that the Board had authorized conduct in violation of section 4(c)(8). However, on analysis this argument can be seen to collapse for the most part into petitioner's basic contention that the Board has no authority to authorize conduct in violation of sections 16 and 21 of the Glass-Steagall Act. The Board's construction of the Bank Holding Company Act in relation to the issue before us would ordinarily be entitled to a high degree of deference, *Board of Governors v. First Lincolnwood Corp.,* 439 U.S. 234, 99 S.Ct. 505, 513, 58 L.Ed.2d 484 (1978); *cf. ICI v. Camp, supra,* 401 U.S. at 626–27, 91 S.Ct. 1091. (Comptroller of the Currency). We cannot, however, abdicate our duty in the final instance to say what the law is, *International Brotherhood of Teamsters v. Daniel,* 439 U.S. 551, 99 S.Ct. 790, 800 & n.20, 58 L.Ed.2d 808 (1979); *SEC v. Sloan,* 436 U.S. 103, 118–19, 98 S.Ct. 1702, 56 L.Ed.2d 148 (1978). And our conclusion, based on the legislative histories of the present section 4(c)(8) and its predecessor statutes, is emphatically that section 4(c)(8) does not empower the Board to authorize conduct of the type at issue here. In light of this conclusion, we find that the appropriate disposition is to vacate the Board's regulation and interpretive ruling rather than to remand to the agency for what would be an expensive, time-consuming, and ultimately pointless reconsideration.

**A.**

There have been three main episodes in the rather complex history of federal legislation aimed at regulating bank holding companies: the Glass-Steagall Act, in 1933; the Bank Holding Company Act, in 1956 (1956 Act); and the Bank Holding Company Act Amendments, in 1970 (1970 Amendments). Of course, the determinative consideration is the meaning to be attributed to section 4(c)(8) in the most recent statute. As will be seen, however, it is necessary to examine the earlier provisions in order to divine what Congress intended in 1970.

As we have noted, *see* note 22 and accompanying text *supra,* Congress addressed the problem of securities activities by bank holding companies in section 19(e) of the Glass-Steagall Act. Congress' approach to this problem differed somewhat from its treatment of securities activities by banks themselves or by their non-holding company affiliates. While in the latter situations Congress simply proscribed the activities in question, *see* notes 19–21 and accompanying text *supra,* in the case of holding company affiliates Congress permitted the affiliation to continue, but only so long as the holding company did not vote its shares in its subsidiary bank.

This somewhat less restrictive treatment of bank holding companies did not stem from any congressional perception that the securities activities of bank holding companies or their non-bank affiliates were any less insidious than those of banks themselves or of firms with which banks were affiliated directly rather than through a holding company parent. Although the Senate hearings [27] that culminated in the Glass-Steagall Act focused primarily on the latter, direct type of securities affiliate, it is clear that the hazards identified at those hearings of affiliation between banks and securities firms were present in the case of holding company affiliates also.[28] As the

---

**27.** *Hearings Pursuant to S.Res. 71 before a Subcomm. of the Senate Comm. on Banking and Currency,* 71st Cong., 3d Sess. (1931) [hereinafter cited as *1931 Hearings* ].

**28.** The hearings identified numerous abuses and unsound practices associated with bank securities activities. *See generally ICI v. Camp, supra,* 401 U.S. at 629–634, 91 S.Ct.

Senate Report on the bill that became the Glass-Steagall Act noted, "[t]he evils of indirect control are similar in the two cases, and they may lead to similar abuses, as is seen when it is noted that holding companies also usually control companies organized for security financing." 1933 S.Rep., *supra* note 28, at 10. The different treatment for holding company affiliates stemmed solely from a congressional concern that, under the commerce clause as then restrictively interpreted, Congress did not have power to force a state-chartered bank holding company to divest itself of a state-chartered securities affiliate.[29]

Section 19(e) of the Glass-Steagall Act applied only to entities "formed for the purpose of, or engaged principally in" the securities business. *See* note 22 *supra*. It is now too late to know whether this language would have encompassed a bank holding company's operation of a closed-end investment company under the limitations of the Board's interpretive ruling.[30] What is important for our purposes, however, is not what the specific language in the Glass-Steagall Act would have meant, but, rather, what subsequent Congresses *thought* that Act to have meant. And as to this question there is little doubt. The broad purpose of the Glass-Steagall Act, and most importantly the effect of the Act *as viewed by later Congresses,* was to divorce completely investment from commercial banking, to "separate as far as possible national and member banks from affiliates of all kinds."[31]

### B.

The holding company provisions of the Glass-Steagall Act, including section 19(e),

1091. The evidence before the subcommittee showed that securities affiliates were involved in a wide variety of activities, including underwriting, wholesaling and retailing securities, holding assets for the benefit of the affiliated bank, buying and selling securities purely for speculative purposes, trading in the bank's own stock in order to "support[ ] the market," and holding real estate assets. *1931 Hearings, supra* note 27, at 1057. There was a danger that banks affiliated with such securities firms would make imprudent use of their own or their depositors' assets, either through direct investment in the securities affiliate or its portfolio or through making unsound loans to it. There was the possibility that a bank's promotional interest in its securities affiliate might cause it to lend its reputation for financial prudence to the affiliate, *see id.* at 1063; *ICI v. Camp, supra,* 401 U.S. at 631, 91 S.Ct. 1091; might distort the bank's credit policies, *see 1931 Hearings, supra* note 27, at 87, 1064; *see also* S.Rep.No.77, 73d Cong., 1st Sess. 9–10 (1933) [hereinafter cited as 1933 S.Rep.]; and might cause the bank to disregard its fiduciary duty to its shareholders, *see 1931 Hearings, supra* note 27, at 266, 1064; *see also* 75 Cong. Rec. 9912 (1933) (remarks of Sen. Bulkley). Further, it was felt that the relation between bank and affiliate mutually reinforced unduly risky investment policies: the banks knew that their unwise investments could be shifted to the affiliate while the affiliates knew that in case of need they had a ready source of funds in the bank. *1931 Hearings, supra* note 27, at 1064. There was also the danger that poor performance of the securities affiliate would cause a loss of public confidence in the bank, *id.* at 1063–64; *see* 77 Cong.Rec. 3835 (1933)

(remarks of Rep. Steagall). In the words of Senator Glass, 75 Cong.Rec. 9887 (1933),

> The committee ascertained . . . that one of the greatest contributions to the unprecedented disaster which has caused this almost incurable depression was made by these bank affiliates. They sent out their high-pressure salesmen and literally filled the bank portfolios of this country with these investment securities. They actually dealt in the stocks of the parent bank. . . . They were organized to evade the law.

29. In the words of the Senate Committee:

> Since the companies are State corporations, Congress has no control over them, except that which may be voluntarily granted. However, since the staple of their ownership or holdings in the stock of National and State member banks, it would seem that Congress may control the conditions under which such stocks may be owned and particularly voted.

1933 S.Rep., *supra* note 28, at 10.

30. There is indirect evidence that at least the industry viewed the Glass-Steagall Act as broadly prohibiting such activity. *See* Securities & Exch. Comm'n, *Report to Congress on Investment Trusts and Investment Companies,* H.R.Doc. 70, 76th Cong., 1st Sess. 59 (1939) ("The most striking changes in the sponsorship of closed-end companies within the period 1929 and 1935 were the disappearance of national bank securities affiliates as sponsors because of the abolition of such affiliates by the [Glass-Steagall Act].").

31. 1933 S.Rep., *supra* note 28, at 10; *see also* 77 Cong.Rec. 3835 (1933) (remarks of Rep. Steagall).

applied only if the subsidiary bank was a member of the Federal Reserve System and the holding company sought to exercise control by actually voting its shares. These limitations ultimately became a major loophole in the Act that permitted bank holding companies to acquire a wide variety of nonbanking subsidiaries.[32] Congress sought to rectify the situation in the Bank Holding Company Act by requiring holding companies (defined to include companies controlling nonmember banks) to divest themselves of their nonbanking businesses. Section 4(a) of the 1956 Act, *as amended,* 12 U.S.C. § 1843(a). However, the 1956 Act provided a series of specific exemptions from this requirement, including the predecessor of the one relevant here, section 4(c)(6) of the Act, 70 Stat. 137. In pertinent part, this provision exempted

> shares of any company all the activities of which are of a financial, fiduciary, or insurance nature and which the Board . . . has determined to be *so closely related to the business of banking or of managing or controlling banks as to be a proper incident thereto* and as to make it unnecessary for the prohibitions of this section to apply in order to carry out the purposes of this Act (emphasis added).

Although the legislative history provides virtually no guidance as to the meaning of this phrase,[33] it would appear that Congress did not intend the exemption to be so broad as to cover shares of an investment adviser operating a closed-end investment company. The 1956 Act, as we have noted, was a loophole-closing law designed to further the Glass-Steagall Act's overarching policy, *see* text accompanying note 31 *supra,* of divorcing investment from commercial banking.[34] There is no doubt that the Glass-Steagall Act was designed to separate banks from investment subsidiaries of their holding company affiliates. We cannot lightly infer that the 1956 Congress intended, *sub silentio,* to undermine what it perceived as a fundamental policy of a law that it was attempting to supplement and strengthen.

Such legislative history as exists supports the view that the Board's discretion in applying this exemption was to be a narrow one. Board Chairman William McChesney Martin reported to both the Senate and House Committees that the Board's authority to exempt shares of closely related businesses was to be "limited." [35] The examples given of activities that obviously fell within this exception were extremely narrow, and did not include any securities related activities.[36] Despite the narrowness of this dis-

**32.** See *Board of Governors v. First Lincolnwood Corp.,* 439 U.S. 234, 99 S.Ct. 505, 511, 58 L.Ed.2d 484 (1978); H.R.Rep.No.609, 84th Cong., 1st Sess. 9 (1955) [hereinafter cited as 1955 H.R.Rep.].

Although this loophole apparently would have permitted bank holding companies to acquire *securities* subsidiaries, Congress was unaware of any such acquisitions. This is further evidence that the financial community viewed the Glass-Steagall Act as having completely divorced the functions of commercial and investment banking.

**33.** See *National Courier Ass'n v. Board of Governors,* 170 U.S.App.D.C. 301, 308, 516 F.2d 1229, 1236 (1975).

**34.** See 1955 H.R.Rep., *supra* note 32, at 16; S.Rep.No.1095, 84th Cong., 1st Sess. 1, 2 (1955); U.S.Code Cong. & Admin.News 1956, p. 2482 [hereinafter cited as 1955 S.Rep.]. *See also* S.Rep.No.1179, 89th Cong., 2d Sess. 2 (1966); U.S.Code Cong. & Admin.News 1966, p. 2385 [hereinafter cited as 1966 S.Rep.] (1956 Act was intended to apply "the general purposes of the Glass-Steagall Act of 1933—to

prevent unduly extensive connections between banking and other businesses." U.S.Code Cong. & Admin.News 1966, p. 2386).

**35.** *See Control and Regulation of Bank Holding Companies: Hearings on H.R. 2674 Before the House Comm. on Banking and Currency,* 84th Cong., 1st Sess. 14 (1955); *Control of Bank Holding Companies: Hearings on S. 880, S. 2350, and H.R. 6227 Before a Subcomm. of the Senate Comm. on Banking and Currency,* 84th Cong., 1st Sess. 76 (1955) [hereinafter cited as *1955 Senate Hearings* ].

In another context of the same hearings, Chairman Martin said that "I would like to have [as] little discretionary authority as I can have." *1955 Senate Hearings, supra,* at 47.

**36.** The Senate Committee reported that obviously exempt activities might include "operation of a credit life-insurance program in connection with bank loans" and "an insurance program under which the insurance proceeds retire the outstanding balance of the mortgage upon the death of the mortgagor in cases where the bank holds the mortgage." *1955 S.Rep.,*

cretion, the House Committee refused to report the provision.[37] When the House acceded to the Senate version containing the exemption, it was with the explicit assurance on the part of the Chairman of the House Committee that the Senate amendments did not make any "material change"[38] in the legislation as it passed the House. In light of this assurance, it is difficult to believe that the House felt that it was agreeing to a grant of discretion to the Board so sweeping as to cut back on the prohibitions of the Glass-Steagall Act.

Our conclusion that the 1956 Act was in all probability not intended to permit bank holding company operation of a closed-end investment company is supported by the subsequent repeal of section 19(e) of the Glass-Steagall Act, the provision that required holding companies wishing to vote their bank's shares to divest themselves of their securities subsidiaries.[39] The Senate Report, commenting on the repeal, noted that section 19(e) "serve[d] no substantial purpose" after passage of the 1956 Act.[40]

### C.

The question then becomes whether the 1970 Amendments to the 1956 Act had the effect of enlarging the Board's authority to the degree contemplated by its regulation and interpretive ruling. The principal purpose of the 1970 Amendments was to pre-

vent one-bank holding companies—which had been exempt from the provisions of the 1956 Act—from entering businesses not related to banking.[41] *Board of Governors v. First Lincolnwood Corp.*, 439 U.S. 234, 99 S.Ct. 505, 512–513, 58 L.Ed.2d 484 (1978). A second and far more controversial purpose for the Amendments, urged by the Nixon Administration and by Federal Reserve officials, was to broaden the variety of enterprises in which bank holding companies could engage. Supporters of this liberalization argued that it would stimulate competition and create economies of scale, to the benefit of the consumer, and would permit banks to adjust flexibly to a dynamic economy.[42] On this goal the House and Senate disagreed; the struggle between them culminated in the rewriting of the bill during a Conference Committee "of great controversy and grinding negotiations and many, many offers and counter offers in an attempt to reach agreement."[43] The product was the type of ambiguous compromise that characteristically results when parties who deeply disagree are under intense pressure to reach a mutually acceptable accommodation.

Section 4(c)(8), as amended, exempts shares of any company the activities of which the Board . . . has determined . . . to be *so closely related to banking or managing or controlling*

---

*supra* note 32, at 13; U.S.Code Cong. & Admin. News 1956, p. 2494.

**37.** 1955 H.R.Rep., *supra* note 29, at 16.

**38.** 102 Cong.Rec. 7165 (1956) (remarks of Rep. Spence).

**39.** Section 13(c) of the Bank Holding Company Act Amendments of 1966, 80 Stat. 242–43 (1966).

**40.** 1966 S.Rep., *supra* note 34, at 12 (emphasis added).

**41.** In the late 1960's, this exemption suddenly began to be used as a means by which single banks could join by merger into a conglomerate structure involving various non-banking businesses. There was a widespread belief in Congress that this loophole had to be closed quickly in order to curb the rapid centralization of American industry into a few gigantic accre-

tions of capital. *See generally*, H.R.Rep.No. 387, 91st Cong., 1st Sess. 2 (1969) [hereinafter cited as 1969 H.R.Rep.]; S.Rep.No.1084, 91st Cong., 2d Sess. 3-4 (1970) U.S.Code Cong. & Admin.News 1970, p. 5519 [hereinafter cited as 1970 S.Rep.].

**42.** *See Bank Holding Company Act Amendments—Hearings on H.R. 6778 Before the House Comm. on Banking and Currency*, 91st Cong., 1st Sess. 86, 88, 198 (1969) [hereinafter cited as *1969 House Hearings*]; *One Bank Holding Company Legislation of 1970: Hearings on S. 1052, S. 1211, S. 1664, S. 3823, and H.R. 6778 Before the Senate Comm. on Banking and Currency*, 91st Cong., 2d Sess. 147, 169, 187 (1970) [hereinafter cited as *1970 Senate Hearings*].

**43.** 116 Cong.Rec. 41963 (1970) (remarks of Rep. Sullivan).

*banks as to be a proper incident thereto.*
. . .

12 U.S.C. § 1843(c)(8) (emphasis added). This language reflects concessions by both the House and Senate conferees. The Senate conferees agreed to retain the "closely related" language of the 1956 Act. The majority House conferees, as relevant to our inquiry, agreed to amend the 1956 Act's phrase "the business of banking" to read simply "banking", and agreed to delete a so-called "laundry list" of activities generally forbidden to bank holding companies.

Both the House and Senate bills, as reported, replaced the "closely related" language with a "functionally related" test.[44] This language had been proposed by Chairman Martin during the House Committee hearings, apparently as a compromise between the Administration's bill, which would have dramatically broadened the activities permitted bank holding companies,[45] and Representative Patman's bill, which would have retained verbatim the standard

of the 1956 Act.[46] As defined by Chairman Martin and his successor, Chairman Arthur Burns, the "functionally related" test would have been broad enough to encompass operating a closed-end investment company.[47] Despite the fact that both Houses passed bills containing the "functionally related" test, the Conference Committee returned to the "closely related" test of the 1956 Act.[48]

The precise significance of the retention of "closely related" is unclear. The four majority House conferees gave it great significance,[49] but the three minority House members refused to sign the statement. The Senate conferees generally downplayed its importance.[50] Courts have disagreed as to its implications.[51]

Whatever its overall significance, however, retention of the "closely related" test evidences a congressional intent that bank holding companies were not to engage in the securities business beyond what was permitted in the 1956 Act. As we have

---

**44.** 1969 H.R.Rep., *supra* note 41, at 1; 1970 S.Rep., *supra* note 41, at 25.

**45.** The Administration proposed to exempt shares of companies whose activities were "financial or related to finance in nature or of a fiduciary or insurance nature." 1970 Conf. Rep., *supra,* at 19; U.S.Code Cong. & Admin. News 1970, p. 5570.

**46.** *See 1969 House Hearings, supra* note 42, at 164.

**47.** *Chairman Martin's statement, id.* at 220 (emphasis supplied), listed as a permissible activity "operating a diversified *open-end* investment company"; but given the lower level of securities activities by closed-end companies, *see* text following note 8 *supra,* the statement would appear to apply *a fortiori* to the latter. Chairman Burns listed within the "functionally related" rubric "acting as investment adviser [or] operating a 'no load' mutual fund." *1970 Senate Hearings, supra* note 13, at 142.

**48.** 1970 Conf.Rep., *supra,* at 5. This action reflected a compromise between the House and Senate bills. The House bill, although it incorporated the "functionally related" test, had been amended on the floor to include a "laundry list" of six activities generally forbidden to bank holding companies. *See* 115 Cong.Rec. 33133–33139 (1969). The majority conferees from the House agreed, *inter alia,* to eliminate the laundry list, but only in exchange for a

return to the existing "closely related" standard. *See* 116 Cong.Rec. 42423 (1970) (remarks of Sen. Sparkman); *id.* at 41954 (remarks of Rep. Widnall). The significance of the concessions by the House conferees is discussed at text accompanying notes 52–63 *infra.*

**49.** They argued that

The decision of the Conferees to reject the "functionally related test" . . . is intended to be construed to mean that the Congress was not convinced that such expansion and liberalization was justified. Consequently, the Congress intends that those activities which the Board and other witnesses claim would have been permitted under the "functionally related test" . . . are not authorized by our decision to retain the "so closely related" test, which is considerably less expansive and liberal . . . .
1970 Conf.Rep., *supra,* at 21; U.S.Code Cong. & Admin.News 1970, p. 5572.

**50.** *See* 116 Cong.Rec. 42422, 42424 (remarks of Sen. Sparkman); *id.* at 42427, 42435 (remarks of Sen. Bennett).

**51.** *Compare National Courier Ass'n v. Board of Governors,* 170 U.S.App D.C. 301, 308, 516 F.2d 1229, 1236 (1975) *with Alabama Ass'n of Ins. Agents v. Board of Governors,* 533 F.2d 224, 239 (5th Cir. 1976), *modified on other grounds,* 558 F.2d 729 (5th Cir. 1977), *cert. denied,* 435 U.S. 904, 98 S.Ct. 1448, 55 L.Ed.2d 494 (1978).

noted, the "closely related" language in the earlier statute was in all likelihood not intended to permit operation of a closed-end investment company. *See* text accompanying notes 33–38 *supra.* The liberalized "functionally related" language, at least as interpreted by the spokesmen for the Board, would have permitted such activity. *See* note 47 and accompanying test, *supra; but see* note 58 and accompanying text *infra.* The rejection of the proposed language, and the return to the earlier standard, strongly suggests that Congress would have intended that the activity at issue in this case not be engaged in.

The "closely related" language, however, was retained only in exchange for a number of liberalizing concessions, two of which are relevant for present purposes. First, the Conference Committee amended the phrase "the business of banking" to read simply "banking." If the meaning of this change is not obvious on its face, the underlying legislative purpose is clear. The Board sought to be freed of a number of its precedents that had restrictively interpreted this phrase to encompass only activities with a direct and significant connection to the actual business of a particular bank holding company's subsidiary bank. For example, the Board had permitted bank holding companies to own a mortgage servicing subsidiary, but had limited the subsidiary's activities to the servicing of mortgages actually held by a subsidiary bank.[52] The deletion of the qualifying phrase "the business of" was suggested to the Conference Committee by Chairman Burns as a means of permitting bank holding companies and their non-bank subsidiaries to engage in activities "related to banking . . . generally,

rather than to the specific business carried on by the subsidiary banks of the particular holding company involved." [53]

■■■ As this court has previously noted, deletion of the qualifier "the business of" significantly liberalized the strictures of section 4(c)(8).[54] Nevertheless, this change, as interpreted by its principal proponent, was designed only to permit bank holding companies and their non-bank subsidiaries to enter *markets* not served by their bank subsidiaries.[55] Nowhere was it suggested that the amendment was intended to broaden the *lines of business* permitted to bank holding companies.[56] As we have seen, however, as of 1970 Congress probably believed, with good reason, that bank holding companies could not legally operate closed-end investment companies.[57] It appears, therefore, that this particular change did not make legitimate the activities sanctioned by the Board's regulation and interpretive ruling.

A second liberalizing action by the Conference Committee was the elimination of the House bill's so-called "laundry list" of activities that bank holding companies could engage in either not at all or to a very limited extent only. One item on this list encompassed the operation of closed-end investment companies, *see* text accompanying note 60, *infra.* At first blush, then, it might appear that Congress' elimination of this prohibition constituted a specific endorsement of the Board's action challenged in this case.

The legislative history, however, tells a far different story. As was evident from our review of the Glass-Steagall Act, the abuses stemming from bank involvement in

---

**52.** *See 1970 Senate Hearings, supra* note 42, at 201.

**53.** 116 Cong.Rec. 41959 (1970).

**54.** *National Courier Ass'n v. Board of Governors,* 170 U.S.App.D.C. 301, 308, 516 F.2d 1229, 1236 (1975). *But see Alabama Ass'n of Ins. Agents v. Board of Governors,* 533 F.2d 224 (5th Cir. 1976), *modified on other grounds,* 558 F.2d 729 (5th Cir. 1977), *cert. denied,* 435 U.S. 904, 98 S.Ct. 1448, 55 L.Ed.2d 494 (1978).

**55.** 116 Cong.Rec. 41959 (1970) (letter from Chairman Burns).

**56.** Chairman Burns' suggestion was clearly a fallback position, a statement of the minimum liberalization he would be willing to accept. In this context, it would seem incongruous to interpret the amendment so expansively as to go significantly beyond the effect claimed for it by its author and chief proponent.

**57.** *See* text accompanying notes 33–38 *supra.*

the *securities* business were the very evils against which that legislation was primarily aimed. Not surprisingly, then, although the meaning of section 4(c)(8) may be controversial in other respects, the evidence is overwhelming that Congress did not intend that provision to cut back on the prohibitions against securities activities contained in the Glass-Steagall Act.

Apparently the only participants in the legislative process even to suggest that bank holding companies might be permitted to act as investment advisers were Chairmen Martin and Burns, the spokesmen for the Board. Significantly, however, even the Nixon Administration's bills, which would have greatly liberalized the activities permitted bank holding companies in other respects, contained an explicit prohibition, in terms identical to section 20 of the Glass-Steagall Act, against entry into the securities business by bank holding companies.[58]

The House bill, as reported, forbade bank holding companies from acquiring the shares of any company "engaging in the underwriting, public sale, or distribution of mutual funds."[59] This provision was not stringent enough for the full House, which amended it on the floor to cover

> [e]ngaging in the issue, flotation, underwriting, public sale, or distribution, at wholesale or retail, or through syndicate participation, of stocks, bonds or other similar securities, or of interests in any such securities, whether or not any such interests are redeemable and whether or not the securities to which any such interests relate are in a fund or account or are subject to discretionary sale or purchase.
> . . . .[60]

The floor amendment was incorporated as part of the laundry list that was eliminated in Conference Committee.

Its elimination, however, did not signal its rejection by the Conferees; to the contrary, this particular part of the laundry list was *supported* by the Nixon Administration. In the words of Dr. Charls Walker, Under Secretary of the Treasury:[61]

> We could have lived with [the "functionally related"] language. Unfortunately, on the floor of the House, they went on to say that certain activities are not functionally related to banking—*one we would agree with to be excluded, the securities business. This has been traditional for years*—but listed some five or more other areas where banks already are operating and have been operating for many, many years.

During the same hearings, Dr. Walker amplified this position with specific reference to investment adviser activities:[62]

> THE CHAIRMAN [Sen. Sparkman]: During the 90th and the 91st Congresses, this committee sent to the Senate Floor legislation which in both instances was adopted, allowing banks to offer commingled managed agency accounts. These are bank-operated mutual funds, which are sold without a sales charge.
>
> The House-passed one bank holding company bill would, in [Sen. Williams'] opinion, specifically prohibit such sales by holding companies.
>
> In your opinion, is such a prohibition justified? What is the Treasury Department's view on the desirability of allowing banks to offer these mutual funds to the public?
>
> Dr. WALKER: The Treasury Department has supported the legislation to which Sen. Williams referred . . . permitting banks in-house, the bank, to operate mutual funds. *We have not sup-*

---

**58.** The Administration bills in both Houses would have barred holding companies from obtaining interests in companies "engaged principally in the issue, flotation, underwriting, public sale, or distribution at wholesale or retail or through syndicate participation of stocks, bonds, debentures, notes, or other securities." *See 1970 Senate Hearings, supra* note 42, at 98 (S.1664); *1969 House Hearings, supra* note 42, at 90, 175, 418, 549 (H.R.9385).

**59.** *See* 115 Cong.Rec. 32910 (1969) (H.R.6778).

**60.** *See id.* at 33133, 33139.

**61.** 1970 *Senate Hearings, supra* note 42, at 18 (emphasis added).

**62.** *Id.* at 27 (emphasis added).

ported legislation which would allow bank affiliates to operate mutual funds, nor would this legislation change present law in that respect.

This particular part of the laundry list was eliminated, not because the Conferees found it objectionable, but only because it was felt to be unnecessary in light of existing prohibitions in the Glass-Steagall Act. This is evident from the following colloquy, 116 Cong.Rec. 42430 (1970):

Mr. WILLIAMS of New Jersey. I have one question I should like to ask the chairman of the committee.

Both the Senate and House bills contained, in section 4(c)(8), substantially similar language reiterating the existing law embodied in the Glass-Steagall Act which provides, essentially, for separation of commercial banking and the securities business. This language does not appear in the bill agreed to by the conferees. I wonder whether there was any intention to imply that the very securities-related activities forbidden to banks directly may nevertheless be engaged in by bank-holding companies or their nonbanking affiliates.

Mr. SPARKMAN. The answer to the Senator's question is that there clearly was not. As it now stands, the Glass-Steagall Act broadly prohibits both banks and their affiliates from engaging in what we commonly understand to be the securities business. There are some specific exceptions, of course, but I can assure you that we did not mean to enlarge or contract them here. We regarded that general prohibition as being so clearly applicable to the subjects of this bill as to make a restatement of it unnecessary. The provision to which you referred is already complicated enough. In short, we did not intend to amend or modify, directly or indirectly, any limitations on the activities of banks, bank-holding companies or any of their affiliates, now con-

tained in the Glass-Steagall Act. If Congress is to change that longstanding, fundamental statement of public policy, we will have to do so in other legislation. I hope there is no longer any misconception on that point.

Mr. WILLIAMS of New Jersey. It is reassuring, indeed, to know that the Glass-Steagall Act has not been disturbed in any way and that there is no intention at all here to do so.

We do not view this colloquy as casting doubt on our conclusion in Part III hereof that sections 16 and 21 of the Glass-Steagall Act do not proscribe operation of closed-end funds by bank holding companies. Most importantly, the Senators' assumption that the Glass-Steagall Act barred securities activities by bank holding companies was in all likelihood based on section 19(e) of the Act, see note 22 *supra*, or possibly, on the securities affiliate provisions of sections 20 and 32, see notes 20–21 *supra*. Section 19(e), of course, was repealed in 1966, see notes 39–40 and accompanying text *supra* ; and, needless to say, we intimate no views as to the applicability to the present case of sections 20 and 32.

Further, this colloquy is significant, not so much for what it says about the Glass-Steagall Act, but for what it implies about the 1970 Amendments to the Bank Holding Company Act. The quoted passage indicates that Congress *perceived* the Glass-Steagall Act as prohibiting securities activities by bank holding companies and their non-bank subsidiaries. Congress, of course, may have been mistaken in its perception, but this possibility has no bearing on its intent in amending section 4(c)(8) of the Bank Holding Company Act. And, as we have noted, Congress did not intend, in the 1970 Amendments, to sanction bank holding company operation of closed-end investment companies.[63]

63. Some of the statements in the legislative history refer to a "mutual fund", which is the popular name for an open-end investment company. It would appear, however, that the phrase was used in a rough generic sense to refer to investment companies of all kinds, rather than to open-end companies as opposed to closed-end ones. The generic usage undoubtedly stemmed from Congress' awareness of efforts on the part of national banks during

Our analysis of the legislative history of section 4(c)(8) is further supported by a consideration of the policies underlying the 1970 Amendments. As we have noted, *see* text accompanying note 41 *supra*, the main thrust of this legislation was to close the one-bank holding company loophole. The burgeoning of one-bank holding companies was thought to pose two somewhat different dangers.

First, there was the danger that bank holding companies would improperly further the interests of their non-bank subsidiaries by abusing the power of their subsidiary banks.[64] Although to a considerable extent the Board's interpretive ruling reduces the likelihood of these abuses, *see* note 14 and accompanying text, *supra*, a number of evils foreseen by Congress in 1970 might not be fully protected against. The interpretive ruling does not prohibit a subsidiary bank from preferentially advancing credit to companies whose shares are owned by the controlled closed-end investment company, or from denying credit to the competitors of those companies.[65] Nor

does it prohibit a subsidiary bank from disclosing confidential information about its depositors to its affiliated investment adviser.[66]

More importantly, the Board's interpretive ruling fails to give due weight to a second evil that was thought to flow from the growth of one-bank holding companies: the centralization of economic power in the American economy. Congress was deeply concerned that the economy was becoming structured along the lines of the Japanese "Zaibatsu" system, in which economic power was concentrated in a few gigantic power centers.[67] This concern for the structural integrity of the economy would be present even if there were fully adequate safeguards against abuse of the subsidiary bank's economic power. Yet the Board's action in the present case, permitting bank holding companies or their affiliates to control the investment decisions for large pools of capital, would seem to portend the type of centralization of power that Congress feared in the 1970 Amendments.[68]

that period to operate mutual funds directly. *See 1970 Senate Hearings, supra* note 42, at 27; 115 Cong.Rec. 32897 (1969) (remarks of Rep. Patman); *cf. ICI v. Camp, supra.* That closed-end companies were not meant to be excluded is evident from the House's floor amendment, *see text* accompanying note 60 *supra*, which explicitly covered "interests in . . . securities, *whether or not any such interests are redeemable. . . ." See also* 115 Cong.Rec. 32902 (1969) (remarks of Rep. Moorhead).

**64.** *See* 115 Cong.Rec. 32891 (1969) *(remarks of* Rep. Bennett); *id.* at 32894 (remarks of Rep. Patman); *id.* at 32903 (remarks of Rep. Moorhead); *1969 House Hearings, supra* note 42, at 197 (testimony of Chairman Martin).

**65.** *See* authorities cited in note 64 *supra.*

**66.** *See* 115 Cong.Rec. 32894 (1969) (remarks of Rep. Patman).

**67.** *See, e. g., 1970 Senate Hearings, supra* note 42, at 13; *1969 House Hearings, supra* note 42, at 9, 21.

This concern was reflected in the President's message to Congress accompanying introduction of the Administration bills:

Left unchecked, the trend toward the combining of banking and business could lead to the formation of a relatively small number of power centers dominating the American

economy. This must not be permitted to happen. . . .
Statement by the President Endorsing Proposed Legislation for Further Regulation, 5 Weekly Comp. of Pres.Doc. 461 (March 24, 1969).

**68.** Apparently the only witness at the House or Senate Hearings who spoke directly to this question was Professor Adolf Berle. His testimony is instructive:

[A] one-bank holding company, with the resources of its bank, with the stockholding power in the bank's trust department, *and especially if it also acquires control of mutual funds which have further stock interests*, can probably attain control of any corporation in the country it really wants to get. . . .
*1969 House Hearings, supra* note 42, at 9 (emphasis supplied). Professor Berle also testified that

[u]nquestionably, entry into the mutual investment field would mean that if the group that controlled the banks also controls the mutual investment funds, it could have a very large influence, perhaps a dominating influence, on the stock market. The huge institutions, by buying or selling, or refusing to buy or sell, as the case might be, in substantial measure could for a time at least determine the level of the stock market. *Id.* at 28.

For the reasons stated above, we vacate the Board's regulation and interpretative ruling challenged in this case, 12 C.F.R. §§ 225.4(a)(5)(ii), 225.125.

*It is so ordered.*