# BOARD OF GOVERNORS OF FEDERAL RESERVE SYSTEM *v.* INVESTMENT COMPANY INSTITUTE

No. 79–927.   Argued October 15, 1980—Decided February 24, 1981

STEVENS, J., delivered the opinion of the Court, in which all other Members joined, except STEWART and REHNQUIST, JJ., who took no part in the consideration or decision of the case, and POWELL, J., who took no part in the decision of the case.

*Stephen M. Shapiro* argued the cause for petitioner. With him on the briefs were *Solicitor General McCree, Assistant Attorney General Daniel, Anthony J. Steinmeyer,* and *Neal L. Petersen.*

*G. Duane Vieth* argued the cause for respondent. With him on the briefs was *Leonard H. Becker.*[*]

JUSTICE STEVENS delivered the opinion of the Court.

In 1956 Congress enacted the Bank Holding Company Act to control the future expansion of bank holding companies and to require divestment of their nonbanking interests.[1] The Act, however, authorizes the Federal Reserve Board (Board) to allow holding companies to acquire or retain ownership in companies whose activities are "so closely related to banking or managing or controlling banks as to be a proper incident thereto."[2] In 1972 the Board amended its

---

[*]*William H. Smith, Keith A. Jones, Alan B. Levenson, Daniel F. Kolb, Geoffrey S. Stewart, Arnold M. Lerman, Michael L. Burack,* and *Edward T. Hand* filed a brief for the American Bankers Association et al. as *amici curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed by *Roger A. Clark, John M. Liftin,* and *Donald J. Crawford* for the Securities Industry Association; and by *Harvey L. Pitt, James H. Schropp,* and *Randy A. Harris* for A. G. Becker Inc.

[1] The stated purpose of the Bank Holding Company Act of 1956 was "[t]o define bank holding companies, control their future expansion, and require divestment of their nonbanking interests." 70 Stat. 133.

[2] Section 4 of the statute, as originally enacted, provided in pertinent part:

"(a) Except as otherwise provided in this Act, no bank holding company shall—

"(1) after the date of enactment of this Act acquire direct or indirect ownership or control of any voting shares of any company which is not a bank. . . .

.        .        .        .        .

"(c) The prohibitions in this section shall not apply—

.        .        .        .        .

"(6) to shares of any company all the activities of which are of a financial, fiduciary, or insurance nature and which the Board after due notice and hearing, and on the basis of the record made at such hearing, by order has determined to be so closely related to the business of banking or of managing or controlling banks as to be a proper incident thereto and as

regulations to enlarge the category of activities that it would regard as "closely related to banking" and therefore permissible for bank holding companies and their nonbanking subsidiaries. Specifically, the Board determined that the services of an investment adviser to a closed-end investment company may be such a permissible activity. The question presented by this case is whether the Board had the statutory authority to make that determination.

The Board's determination, which was implemented by an amendment to its "Regulation Y," permits bank holding companies and their nonbanking subsidiaries to act as an investment adviser as that term is defined by the Investment Company Act of 1940.[3] Although the statutory definition

---

to make it unnecessary for the prohibitions of this section to apply in order to carry out the purposes of this Act . . . ." 70 Stat. 135–137.

The relevant exemption is now found in § 4 (c) (8) which allows holding company ownership of:

"(8) shares of any company the activities of which the Board after due notice and opportunity for hearing has determined (by order or regulation) to be so closely related to banking or managing or controlling banks as to be a proper incident thereto. In determining whether a particular activity is a proper incident to banking or managing or controlling banks the Board shall consider whether its performance by an affiliate of a holding company can reasonably be expected to produce benefits to the public, such as greater convenience, increased competition, or gains in efficiency, that outweigh possible adverse effects, such as undue concentration of resources, decreased or unfair competition, conflicts of interests, or unsound banking practices. In orders and regulations under this subsection, the Board may differentiate between activities commenced de novo and activities commenced by the acquisition, in whole or in part, of a going concern." 12 U. S. C. § 1843 (c) (8).

[3] See 36 Fed. Reg. 16695, 17514 (1971); 37 Fed. Reg. 1463 (1972); 12 CFR § 225.4 (a) (5) (ii) (1980). The 1972 amendment to Regulation Y made the following addition to the list of permissible activities:

"(ii) serving as investment adviser, as defined in section 2 (a) (20) of the Investment Company Act of 1940, to an investment company registered under that Act."

is a detailed one,[4] the typical relationship between an investment adviser and an investment company can be briefly described. Investment companies, by pooling the resources of small investors under the guidance of one manager, provide those investors with diversification and expert management.[5] Investment advisers generally organize and manage investment companies pursuant to a contractual arrangement with the company.[6] In return for a management fee, the adviser

---

[4] The definition of an investment adviser in § (2)(a)(20) of the Investment Company Act of 1940 reads as follows:

"(20) 'Investment adviser' of an investment company means (A) any person (other than a bona fide officer, director, trustee, member of an advisory board, or employee of such company, as such) who pursuant to contract with such company regularly furnishes advice to such company with respect to the desirability of investing in, purchasing or selling securities or other property, or is empowered to determine what securities or other property shall be purchased or sold by such company, and (B) any other person who pursuant to contract with a person described in clause (A) of this paragraph regularly performs substantially all of the duties undertaken by such person described in said clause (A); but does not include (i) a person whose advice is furnished solely through uniform publications distributed to subscribers thereto, (ii) a person who furnishes only statistical and other factual information, advice regarding economic factors and trends, or advice as to occasional transactions in specific securities, but without generally furnishing advice or making recommendations regarding the purchase or sale of securities, (iii) a company furnishing such services at cost to one or more investment companies, insurance companies, or other financial institutions, (iv) any person the character and amount of whose compensation for such services must be approved by a court, or (v) such other persons as the Commission may by rules and regulations or order determine not to be within the intent of this definition." 15 U. S. C. § 80a-2 (20).

[5] 1 T. Frankel, The Regulation of Money Managers, I-A, § 2, p. 6 (1978).

[6] *Id.*, at I-B, § 4, pp. 9–10; see Wharton School Study of Mutual Funds, H. R. Rep. No. 2274, 87th Cong., 2d Sess., 467–477 (1962) (hereinafter Wharton School Study); *Burks* v. *Lasker,* 441 U. S. 471, 480–481 (1979).

selects the company's investment portfolio and supervises most aspects of its business.[7]

The Board issued an interpretive ruling in connection with its amendment to Regulation Y. That ruling distinguished "open-end" investment companies (commonly referred to as "mutual funds") from "closed-end" investment companies. The ruling explained that "a mutual fund is an investment company, which, typically, is continuously engaged in the issuance of its shares and stands ready at any time to redeem the securities as to which it is the issuer; a closed-end investment company typically does not issue shares after its initial organization except at infrequent intervals and does not stand ready to redeem its shares."[8] Because open-end investment companies will redeem their shares, they must constantly issue securities to prevent shrinkage of assets.[9] In contrast, the capital structure of a closed-end company is similar to that of other corporations; if its shareholders wish to sell, they must do so in the marketplace. Without any obligation to redeem, closed-end companies need not continuously seek new capital.[10]

---

[7] Securities and Exchange Commission Report on the Public Policy Implications of Investment Company Growth, H. R. Rep. No. 2337, 89th Cong., 2d Sess., 8 (1966).

[8] 12 CFR § 225.125 (c) (1980).

[9] Hearings on S. 3580 before a Senate Subcommittee on Banking and Currency, 76th Cong., 3d Sess., 43 (1940) (hereinafter 1940 Senate Hearings) (statement of Robert E. Healy). As the SEC Report on the Public Policy Implications of Investment Company Growth recognized with respect to open-end funds:

"Since there will always be some shareholders who want to sell, an open-end company must comply with continuous demands for cash from selling stockholders. To offset the resulting cash outflow and because of the strong incentives for growth created by the structure of the industry, the managers of virtually all open-end companies vigorously promote sales of new shares at all times." H. R. Rep. No. 2337, *supra*, at 42–43.

[10] *Id.*, at 42.

The Board's interpretive ruling expressed the opinion that a bank holding company may not lawfully sponsor, organize, or control an open-end investment company,[11] but the Board perceived no objection to sponsorship of a closed-end investment company provided that certain restrictions are observed.[12] Among those restrictions is a requirement that the investment company may not primarily or frequently engage in the issuance, sale, and distribution of securities; a requirement that the investment adviser may not have any ownership interest in the investment company, or extend credit to it; and a requirement that the adviser may not underwrite or otherwise participate in the sale or distribution of the investment company's securities.[13]

---

[11] The ruling would apparently permit a bank holding company to provide investment advice to an open-end investment company if the holding company does not have the authority to make investment decisions or otherwise to control investments of such an advisee. Respondent has not specifically challenged the legality of a relationship that is purely advisory in character.

[12] "(f) In the Board's opinion, the Glass-Steagall Act provisions, as interpreted by the U. S. Supreme Court, forbid a bank holding company to sponsor, organize or control a mutual fund. However, the Board does not believe that such restrictions apply to closed-end investment companies as long as such companies are not primarily or frequently engaged in the issuance, sale and distribution of securities." 12 CFR § 225.125 (f) (1980).

[13] Pertinent parts of the interpretive ruling read as follows:

"In no case, however, should a bank holding company act as investment adviser to an investment company which has a name that is similar to, or a variation of, the name of the holding company or any of its subsidiary banks.

"(g) In view of the potential conflicts of interests that may exist, a bank holding company and its bank and nonbank subsidiaries should not (1) purchase for their own account securities of any investment company for which the bank holding company acts as investment adviser; (2) purchase in their sole discretion, any such securities in a fiduciary capacity (including as managing agent); (3) extend credit to any such investment company; or (4) accept the securities of any such investment company as

Respondent Investment Company Institute, a trade association of open-end investment companies, commenced this litigation challenging as in excess of the Board's statutory authority the determination that investment adviser services are "closely related" to banking. Both in proceedings before the Board and in a direct review proceeding in the United States Court of Appeals for the District of Columbia Circuit, respondent based this challenge on the Banking Act of 1933, commonly known as the Glass-Steagall Act, in which Congress placed restrictions on the securities-related business of banks in order to protect their depositors.[14]

The Court of Appeals rejected respondent's argument that Regulation Y, as amended, violated the Glass-Steagall Act, relying on the fact that the prohibitions of §§ 16 and 21 of

collateral for a loan which is for the purpose of purchasing securities of the investment company.

"(h) A bank holding company should not engage, directly or indirectly, in the sale or distribution of securities of any investment company for which it acts as investment adviser. Prospectuses or sales literature should not be distributed by the holding company, nor should any literature be made available to the public at any offices of the holding company. In addition, officers and employees of bank subsidiaries should be instructed not to express any opinion with respect to advisability of purchase of securities of any investment company for which the bank holding company acts as investment adviser. Customers of banks in a bank holding company system who request information on an unsolicited basis regarding any investment company for which the bank holding company acts as investment adviser may be furnished the name and address of the fund and its underwriter or distributing company, but the names of bank customers should not be furnished by the bank holding company to the fund or its distributor. Further, a bank holding company should not act as investment adviser to a mutual fund which has offices in any building which is likely to be identified in the public's mind with the bank holding company." 12 CFR §§ 225.125 (f), (g), (h) (1980).

[14] The stated purpose of the 1933 Act was "[t]o provide for the safer and more effective use of the assets of banks, to regulate interbank control, to prevent the undue diversion of funds into speculative operations, and for other purposes." 48 Stat. 162.

54

that Act [15] apply only to banks rather than to bank holding companies or their nonbanking subsidiaries.  196 U. S. App. D. C. 97, 606 F. 2d 1004.  The court nevertheless concluded that § 4 (c)(8) of the Bank Holding Company Act did not authorize the regulation.  The court reasoned that the legislative history of the Act demonstrates that Congress did not intend the Bank Holding Company Act to restrict the scope of the Glass-Steagall Act.  Because the court read the legislative history to indicate that Congress perceived the Glass-Steagall Act as an effort to effect as complete a separation as possible between the securities business and the commercial banking business, the court read a similar intent into the Bank Holding Company Act.  The Court of Appeals believed that activities permitted by the challenged regulation were not consistent with the congressional intent to effect this separation.

We granted certiorari because of the importance of the Court of Appeals holding.  444 U. S. 1070.  We are persuaded

---

[15] Section 16, as originally enacted, provided in pertinent part:

"The business of dealing in investment securities by [a national bank] shall be limited to purchasing and selling such securities without recourse, solely upon the order, and for the account of, customers, and in no case for its own account, and [a national bank] shall not underwrite any issue of securities: *Provided,* That [a national bank] may purchase for its own account investment securities under such limitations and restrictions as the Comptroller of the Currency may by regulation prescribe . . . ."  48 Stat. 184.

Section 16, as amended, is now codified at 12 U. S. C. § 24 (Seventh).

Section 21, provides, in pertinent part, that it is unlawful

"[f]or any person, firm, corporation, association, business trust, or other similar organization, engaged in the business of issuing, underwriting, selling, or distributing, at wholesale or retail, or through syndicate participation, stocks, bonds, debentures, notes, or other securities, to engage at the same time to any extent whatever in the business of receiving deposits subject to check or to repayment upon presentation of a passbook, certificate of deposit, or other evidence of debt, or upon request of the depositor . . . ."  48 Stat. 189, 12 U. S. C. § 378.

that the language of both the Bank Holding Company Act and the Glass-Steagall Act, as well as our interpretation of the Glass-Steagall Act in *Investment Company Institute* v. *Camp*, 401 U. S. 617 (1971), supports the Board. Moreover, contrary to the view of the Court of Appeals, we are persuaded that the regulation is consistent with the legislative history of both statutes.

I

The services of an investment adviser are not significantly different from the traditional fiduciary functions of banks. The principal activity of an investment adviser is to manage the investment portfolio of its advisee—to invest and reinvest the funds of the client. Banks have engaged in that sort of activity for decades.[16] As executor, trustee, or managing agent of funds committed to its custody, a bank regularly buys and sells securities for its customers. Bank trust departments manage employee benefits trusts, institutional and corporate agency accounts, and personal trust and agency accounts.[17] Moreover, for over 50 years banks have performed these tasks for trust funds consisting of commingled funds of customers.[18] These common trust funds adminis-

---

[16] A memorandum submitted to the Board on behalf of the American Bankers Association states, in part: "For well over a century, banks and trust companies in every state have managed and administered customers' investment funds in the form of trusts, estates and agency accounts." App. 20. The accuracy of that statement is not challenged.

[17] See Securities Exchange Commission Institutional Investor Study Report Summary, H. R. Doc. No. 92-64, pt. 8, pp. 34-35 (1971).

[18] As we recognized in *Investment Company Institute* v. *Camp*, 401 U. S. 617 (1971):

"National banks were granted trust powers in 1913. Federal Reserve Act, § 11, 38 Stat. 261. The first common trust fund was organized in 1927, and such funds were expressly authorized by the Federal Reserve Board by Regulation F promulgated in 1937. Report on Commingled or Common Trust Funds Administered by Banks and Trust Companies, H. R. Doc. No. 476, 76th Cong., 2d Sess., 4-5 (1939). For at least a generation,

tered by banks would be regulated as investment companies by the Investment Company Act of 1940 were they not exempted from the Act's coverage.[19] The Board's conclusion that the services performed by an investment adviser are "so closely related to banking . . . as to be a proper incident thereto" is therefore supported by banking practice and by a normal reading of the language of § 4 (c)(8).[20]

The Board's determination of what activities are "closely related" to banking is entitled to the greatest deference.[21]

---

therefore, there has been no reason to doubt that a national bank can, consistently with the banking laws, commingle trust funds on the one hand, and act as a managing agent on the other. No provision of the banking law suggests that it is improper for a national bank to pool trust assets, or to act as a managing agent for individual customers, or to purchase stock for the account of its customers." *Id.*, at 624–625.

See also *Mullane* v. *Central Hanover Bank & Trust Co.*, 339 U. S. 306, 307–308 (1950).

[19] See 15 U. S. C. § 80a–3 (c)(3). As David Schenker, an attorney for the SEC, explained at the 1940 Senate Hearings: "We have exempted any common trust fund . . . . Those common trust funds are a sort of investment trust in which trustees can participate, and they are managed by banks and trust companies." 1940 Senate Hearings, at 181.

[20] The normal reading of the language of § 4 (c)(8) takes on additional significance in light of the fact, recognized by the Court of Appeals, that the legislative history of the section provides no real guidance as to the scope of the exception contained therein. 196 U. S. App. D. C. 97, 110, 606 F. 2d 1004, 1017.

[21] Commenting on an interpretation of the Glass-Steagall Act by the Board in *Board of Governors* v. *Agnew*, 329 U. S. 441 (1947), Justice Rutledge observed:

"Not only because Congress has committed the system's operation to their hands, but also because the system itself is a highly specialized and technical one, requiring expert and coordinated management in all its phases, I think their judgment should be conclusive upon any matter which, like this one, is open to reasonable difference of opinion. Their specialized experience gives them an advantage judges cannot possibly have, not only in dealing with the problems raised for their discretion by the system's working, but also in ascertaining the meaning Congress had in mind in prescribing the standards by which they should administer it. Accordingly

Such deference is particularly appropriate in this case because the regulation under attack is merely a general determination that investment advisory services which otherwise satisfy the restrictions imposed by the Board's interpretive ruling constitute an activity that is so closely related to banking as to be a proper incident thereto.[22] Because the authority for any specific investment advisory relationship must be preceded by a further determination by the Board that the relationship can be expected to provide benefits for the public, the Board will have the opportunity to ensure that no bank holding company exceeds the bounds of a bank's traditional fiduciary function of managing customers' accounts.[23] Thus

---

their judgment in such matters should be overturned only where there is no reasonable basis to sustain it or where they exercise it in a manner which clearly exceeds their statutory authority." *Id.*, at 450.

See also *Board of Governors* v. *First Lincolnwood Corp.*, 439 U. S. 234, 248 (1978).

[22] A determination by the Board that a particular service is closely related to banking does not end the Board's role. A bank holding company must submit a specific application with respect to each service it wishes to perform. The Board then determines on the basis of the circumstances of each applicant whether the proposed activity would serve the public interest. See 12 CFR § 225.4 (a) (1980); H. R. Conf. Rep. No. 91–1747, p. 22 (1970); *NCNB Corp.* v. *Board of Governors*, 599 F. 2d 609, 610–611 (CA4 1979). If a bank holding company wishes to acquire or retain shares of a company engaged in an activity already approved as "closely related," the Board publishes notice of the application in the Federal Register for public comment on the "public benefits" issue. 12 CFR § 225.4 (b)(2) (1980).

[23] The Senate Report on the Bank Holding Company Act indicated the importance of the role of the Board in determining what activities would be permitted under § 4 (c)(8):

"[T]here are many other activities of a financial, fiduciary, or insurance nature which cannot be determined to be closely related to banking without a careful examination of the particular type of business carried on under such activity. For this reason your committee deems it advisable to provide a forum before an appropriate Federal authority in which decisions concerning the relationship of such activities to banking can be determined

unless the Glass-Steagall Act requires a contrary conclusion, the Board's interpretation of the plain language of the Bank Company Holding Act must be upheld.

## II

Respondent's principal attack on the Board's general determination that investment adviser services are so closely related as to be a proper incident to banking proceeds from the premise that if such services were performed by a bank, the bank would violate §§ 16 and 21 of the Glass-Steagall Act.[24] Respondent therefore argues that such services may

in each case on its merits." S. Rep. No. 1095, 84th Cong., 1st Sess., pt. 1, p. 13 (1955) (hereinafter 1955 Senate Report).

The legislative history of the Bank Holding Company Act Amendments of 1970 indicated that the Amendments were not intended to cut back on the discretion afforded the Board. As Senator Bennett, a member of the Conference Committee, indicated, the 1970 Amendments maintained "maximum flexibility for the Federal Reserve Board to determine the activities in which a bank holding company and its subsidiaries may engage . . . ." 116 Cong. Rec. 42432 (1970). See n. 58, *infra*.

[24] See n. 15, *supra*. We agree with the Court of Appeals that §§ 16 and 21 apply only to banks and not to bank holding companies. Section 21 prohibits firms engaged in the securities business from also receiving deposits. Bank holding companies do not receive deposits, and the language of § 21 cannot be read to include within its prohibition separate organizations related by ownership with a bank, which does receive deposits. As the following colloquy, cited by the Court of Appeals, between Senator Glass, cosponsor of the bill, and Senator Robinson indicates, the drafters of the bill agreed with this construction:

"Mr. GLASS. . . . Here [§ 21] we prohibit the large private banks, whose chief business is investment business, from receiving deposits. We separate them from the deposit banking business.

.        .        .        .        .

"Mr. ROBINSON of Arkansas. That means if they wish to receive deposits they must have separate institutions for that purpose?

"Mr. GLASS. Yes." 77 Cong. Rec. 3730 (1933).

Section 16, which prohibits a national bank from "underwriting" any issue of a security, by its terms applies only to banks. Although respondent contended here and in the Court of Appeals that the bank and its hold-

never be regarded as a "proper incident" that could be performed by a bank affiliate.[25] We reject both the premise and the conclusion of this argument. The performance of

---

ing company should be treated as a single entity for purposes of applying §§ 16 and 21, the structure of the Glass-Steagall Act indicates to the contrary. Sections 16 and 21 flatly prohibit banks from engaging in the underwriting business. Organizations affiliated with banks, however, are dealt with by other sections of the Act. Section 19 (e), 48 Stat. 188, repealed in pertinent part, 80 Stat. 242, prohibited bank holding companies from voting the shares of a bank subsidiary unless the holding company divested itself of any interest in a subsidiary formed for the purpose of or "engaged principally" in the issuance or underwriting of securities. More importantly, § 20 of the Act, 48 Stat. 188, prohibits national banks or state bank members of the Federal Reserve System from owning securities affiliates, defined in § 2 (b), 48 Stat. 162, that are "engaged principally" in the issuance or underwriting of securities. Thus the structure of the Act reveals a congressional intent to treat banks separately from their affiliates. The reading of the Act urged by respondent would render § 20 meaningless.

[25] Respondent also argues that the regulation authorizes banks as well as bank holding companies and nonbank subsidiaries to act as investment advisers. The operative definition of "bank holding company" in the Board's interpretive ruling includes "their bank and nonbank subsidiaries." 12 CFR § 225.125 (c) (1980). Respondent contends that banks have relied on the interpretive ruling as authorization for them to sponsor investment companies. Brief for Respondent 13–18. The simple answer to this argument is that not only does the interpretive ruling confer no authorization to undertake any activities, but also the Board does not have the power to confer such authorization on banks. As the Board's opinion in this case stated:

"[T]he Board's regulation was adopted pursuant to section 4 (c) (8) of the Bank Holding Company Act and authorizes investment advisory activity to be conducted by a nonbanking subsidiary of the holding company. The authority of national banks or state member banks to furnish investment advisory services does not derive from the Board's regulation; such authority would exist independently of the Board's regulation and its scope is to be determined by a particular bank's primary supervisory agency." App. to Pet. for Cert. 61a.

Thus the regulation applies only to bank holding companies. Although the interpretive ruling applies to banks, that ruling contains only restric-

investment advisory services by a bank would not necessarily violate § 16 or § 21 of the Glass-Steagall Act. Moreover, bank affiliates may be authorized to engage in certain activities that are prohibited to banks themselves.[26]

---

tions on the activity permitted by the regulation. The Board's opinion explained that the restrictions contained in the interpretive ruling were intended to apply to banks when the investment advisory function was performed by a holding company or its nonbanking subsidiaries. *Ibid.* This imposition of restrictions on banks prevented bank holding companies and their nonbanking subsidiaries from evading the restrictions by allowing subsidiary banks to perform the restricted activities. Whether banks are mistakenly relying on the Board's interpretive ruling to derive permission to act as investment advisers is not relevant to the determination of the Board's power to enact the challenged regulation. We do note that at the time of the Court of Appeals decision, the Board represented that no bank had sought the Board's approval for an investment adviser service that is a prerequisite to acting pursuant to Board authority. See 196 U. S. App. D. C., at 107, n. 26, 606 F. 2d, at 1014, n. 26. Thus although in the discussion to follow we refer to bank affiliation with investment companies, this reference is only for purposes of addressing respondent's argument that banks would violate the Glass-Steagall Act by serving as investment advisers to closed-end investment companies.

[26] Respondent also contends that the Board's regulation violates § 20 of the Glass-Steagall Act. The Court of Appeals did not consider the § 20 argument, but the respondent has submitted this contention to answer the Board's argument that § 20 is the only relevant section of the Glass-Steagall Act for purposes of determining what services bank holding companies may provide. Section 20 provides in pertinent part:

"[N]o [national bank] shall be affiliated . . . with any corporation, association, business trust or other similar organization engaged principally in the issue, flotation, underwriting, public sale, or distribution at wholesale or retail or through syndicate participation of stocks, bonds, debentures, notes or other securities." 48 Stat. 188, 12 U. S. C. § 377.

Although "affiliate" as originally defined in § 2 (b) of the Glass-Steagall Act did not include holding companies, see 48 Stat. 162, Congress in 1966 amended the statute to bring holding companies within the definition of "affiliate" and thereby within the reach of § 20. 80 Stat. 242, 12 U. S. C. § 221a (b) (4). In *Board of Governors* v. *Agnew*, 329 U. S. 441 (1947), the Court recognized the difference in the extent of prohibition of securities-related activities reflected in the use of the word "engaged"

It is familiar history that the Glass-Steagall Act was enacted in 1933 to protect bank depositors from any repetition of the widespread bank closings that occurred during the Great Depression.[27] Congress was persuaded that speculative activities, partially attributable to the connection between commercial banking and investment banking, had contributed to the rash of bank failures.[28] The legislative history reveals that securities firms affiliated with banks had

in § 21 as opposed to the use of the words "engaged principally" in § 20. Thus a less stringent standard should apply to determine whether a holding company has violated § 20 than is applied to a determination of whether a bank has violated §§ 16 and 21. Nevertheless, the Board's regulation goes beyond the less stringent standard by prohibiting *any* involvement by the bank holding company or its subsidiaries in the underwriting or selling of the securities of the investment company. Moreover, the distinction here between closed-end and open-end investment companies is crucial. If, as respondent contends, the closed-end company's initial issuance of stock were sufficient to render the company "principally engaged" in the issuance of securities, then all corporations, including banks, would at some point be engaged principally in the issuance of securities. We cannot accept this premise. Moreover, given our rejection of this premise, it follows that the investment adviser to such a company is clearly not engaged principally in the issuance of securities. To a certain extent, our conclusions *infra* with respect to §§ 16 and 21 subsume the argument that the regulation is inconsistent with § 20.

[27] Representative Steagall, cosponsor of the bill, stated in debate:

"[T]he purpose of this legislation is to protect the people of the United States in the right to have banks in which their deposits will be safe. They have a right to expect of Congress the establishment and maintenance of a system of banks in the United States where citizens may place their hard earnings with reasonable expectation of being able to get them out again upon demand." 77 Cong. Rec. 3837 (1933).

This purpose is also reflected by the fact that a major portion of the Act, around which most of the debate by both Houses centered, was the creation of the Federal Deposit Insurance Corporation. See 48 Stat. 168–180.

[28] S. Rep. No. 77, 73d Cong., 1st Sess., 6, 10 (1933) (hereinafter 1933 Senate Report). Representative Koppleman stated in debate: "One of the chief causes of this depression has been the diversion of depositors' moneys into the speculative markets of Wall Street." 77 Cong. Rec. 3907 (1933). See also *id.*, at 3835 (remarks of Rep. Steagall).

engaged in perilous underwriting operations, stock speculation, and maintaining a market for the bank's own stock, often with the bank's resources.[29]   Congress sought to separate national banks, as completely as possible, from affiliates engaged in such activities.[30]

Sections 16 and 21 of the Glass-Steagall Act approach the legislative goal of separating the securities business from the banking business from different directions.   The former places a limit on the power of a bank to engage in securities transactions; the latter prohibits a securities firm from engaging in the banking business.   Section 16 expressly prohibits a bank from "underwriting" any issue of a security or purchasing any security for its own account.   The Board's interpretive ruling here expressly prohibits a bank holding company or its subsidiaries from participating in the "sale or distribution" of securities of any investment company for which it acts as investment adviser.   12 CFR § 225.125 (h) (1980).   The ruling also prohibits bank holding companies and their subsidiaries from purchasing securities of the investment company for which it acts as investment adviser. § 225.125 (g).[31]   Therefore, if the restrictions imposed by the Board's interpretive ruling are followed, investment advisory services—even if performed by a bank—would not violate the requirements of § 16.

We are also satisfied that a bank's performance of such services would not necessarily violate § 21.   In contrast to § 16, § 21 prohibits certain kinds of securities firms from engaging in banking.   The § 21 prohibition applies to any organization "engaged in the business of issuing, underwriting, selling, or distributing" securities.   Such a securities firm may not engage at the same time "to any extent whatever in

---

[29] 1933 Senate Report, at 10.   See also 77 Cong. Rec. 3835 (1933) (remarks of Rep. Steagall); *id.*, at 4179, 4180 (remarks of Sen. Bulkley).

[30] 1933 Senate Report, at 10.   See also 77 Cong. Rec. 3835 (1933) (remarks of Rep. Steagall); *id.*, at 4179, 4180 (remarks of Sen. Bulkley).

[31] See n. 13, *supra.*

the business of receiving deposits." The management of a customer's investment portfolio—even when the manager has the power to sell securities owned by the customer—is not the kind of selling activity that Congress contemplated when it enacted § 21. If it were, the statute would prohibit banks from continuing to manage investment accounts in a fiduciary capacity or as an agent for an individual. We do not believe Congress intended that such a reading be given § 21.[32] Rather, § 21 presented the converse situation of § 16 and was intended to require securities firms such as underwriters or brokerage houses to sever their banking connections. It surely was not intended to require banks to abandon an accepted banking practice that was subjected to regulation under § 16.[33]

Even if we were to assume that a bank would violate the Glass-Steagall Act by engaging in certain investment advisory

---

[32] The statutory prohibition in § 21 applies to firms "engaged in the business of issuing, underwriting, selling, or distributing at wholesale or retail, or through syndicate participation, stocks, bonds, debentures, notes, or other securities . . ."; that is hardly the sort of language that would be used to describe an investment adviser. Compare the statutory definition of an investment adviser quoted in n. 4, *supra*.

[33] Section 21 originally prohibited firms "engaged principally" in the business of issuing securities from receiving deposits. Senator Bulkley introduced an amendment striking the word "principally" because "[i]t has become apparent that at least some of the great investment houses are engaged in so many forms of business that there is some doubt as to whether the investment business is the principal one." 77 Cong. Rec. 4180 (1933). This amendment indicates the type of institution which Congress focused upon in § 21. Senator Glass, in discussing the effect that § 21 would have upon the credit supply, indicated that "[i]f we confine to their proper business activities these large private concerns whose principal business is that of dealing in investment securities, . . . and many of which unloaded millions of dollars of worthless investment securities upon the banks of this country, and deny them the right to conduct the deposit bank business at the same time, there will be no difficulty on the face of the globe in financing any business enterprise that needs to be financed at a profit in this country." 77 Cong. Rec. 4179 (1933).

services, it would not follow that a bank holding company could never perform such services. In both the Glass-Steagall Act itself and in the Bank Holding Company Act, Congress indicated that a bank affiliate may engage in activities that would be impermissible for the bank itself. Thus, § 21 of Glass-Steagall entirely prohibits the same firm from engaging in banking and in the underwriting business, whereas § 20 does not prohibit bank affiliation with a securities firm unless that firm is "engaged principally" in activities such as underwriting.[34] Further, § 4 (c) (7) of the Bank Holding Company Act, which authorizes holding companies to purchase and own shares of investment companies, permits investment activity by a holding company that is impermissible for a bank itself.[35] Finally, inasmuch as the Bank Holding Company Act requires divestment only of nonbanking interests, the § 4 (c) (8) exception would be unnecessary if it applied only to services that a bank could legally perform. Thus even if the Glass-Steagall Act did prohibit banks from acting as investment advisers, that prohibition would not necessarily preclude the Board from determining that such adviser services would be permissible under § 4 (c) (8).

In all events, because all that is presently at issue is the Board's preliminary authorization of such services, rather than approval of any specific advisory relationship, speculation about possible conflicts with the Glass-Steagall Act is plainly not a sufficient basis for totally rejecting the Board's carefully considered determination.

### III

Our conclusions with respect to the Glass-Steagall Act are in no way altered by consideration of our decision in *Invest-*

---

[34] See nn. 15, 26, *supra.*

[35] See 12 U. S. C. § 1843 (c) (7). Section 4 (c) (7) even permits a bank holding company to own a controlling interest in an investment company, and § 4 (a) (2) permits a holding company to provide management services to companies in which it has a controlling interest. See 12 U. S. C. § 1843 (a) (2).

*ment Company Institute* v. *Camp,* 401 U. S. 617 (1971). The Court there held that a regulation issued by the Comptroller of the Currency purporting to authorize banks to operate mutual funds violated §§ 16 and 21 of the Glass-Steagall Act. The mutual fund under review in that case was the functional equivalent of an open-end investment company.[36] Because the authorization at issue in this case is expressly limited to closed-end investment companies, the holding in *Camp* is clearly not dispositive. Respondent argues, however, that both the Court's reasoning in *Camp* and its description of the "more subtle hazards" created by the performance of investment advisory services by a bank are inconsistent with the Board's action. We disagree.

In *Camp* the Court relied squarely on the literal language of §§ 16 and 21 of the Glass-Steagall Act. After noting that § 16 prohibited the underwriting by a national bank of any issue of securities and the purchase for its own account of shares of stock of any corporation, and that § 21 prohibited corporations from both receiving deposits and engaging in issuing, underwriting, selling, or distributing securities, the Court recognized that the statutory language plainly applied to a bank's sale of redeemable and transferable "units of participation" in a common investment fund operated by the bank. 401 U. S., at 634. Because the Court held that the bank was the underwriter of the fund's units of participation within the meaning of the Investment Company Act of 1940,

---

[36] It was described as follows:

"Under the plan the bank customer tenders between $10,000 and $500,000 to the bank, together with an authorization making the bank the customer's managing agent. The customer's investment is added to the fund, and a written evidence of participation is issued which expresses in 'units of participation' the customer's proportionate interest in fund assets. Units of participation are freely redeemable, and transferable to anyone who has executed a managing agency agreement with the bank. The fund is registered as an investment company under the Investment Company Act of 1940. The bank is the underwriter of the fund's units of participation within the meaning of that Act." 401 U. S., at 622–623.

*id.*, at 622–623, the Comptroller attempted to avoid the reach of § 16 by arguing that the units of participation were not "securities" within the meaning of the Glass-Steagall Act. The Court's contrary determination led inexorably to the conclusion that § 16 had been violated.

This case presents an entirely different issue. No one could dispute the fact that the shares in a closed-end investment company are securities. But as we have indicated, such securities are not issued, sold, or underwritten by the investment adviser. In contrast to the bank's activities in issuing, underwriting, selling, and redeeming the units of participation in the *Camp* case, in this case the Board's interpretive ruling expressly prohibits such activity.[37]

The Court in *Camp* recognized that in enacting the Glass-Steagall Act, Congress contemplated other hazards in addition to the danger of banks using bank assets in imprudent securities investments.[38] But none of these "more subtle haz-

---

[37] Moreover, the decision by an investment adviser to purchase or sell securities on behalf of a closed-end investment company is critically different from the comparable decision by the operator of the mutual fund reviewed in *Camp*. When an adviser makes a change in the securities portfolio of a closed-end company, the adviser is acting for the account of its customer—not for its own account. In *Camp*, however, the securities in the portfolio of the mutual fund were at least arguably the property of the bank itself and therefore the bank was arguably acting for its own account within the meaning of § 16.

[38] The Court recognized that because the bank and its affiliate would be closely associated in the public mind, public confidence in the bank might be impaired if the affiliate performed poorly. Further, depositors of the bank might lose money on investments purchased in reliance on the relationship between the bank and its affiliate. The pressure on banks to prevent this loss of public confidence could induce the bank to make unsound loans to the affiliate or to companies in whose stock the affiliate has invested. Moreover, the association between the commercial and investment bank could result in the commercial bank's reputation for prudence and restraint being attributed, without justification, to an enterprise selling stocks and securities. Furthermore, promotional considerations might induce banks to make loans to customers to be used

ards" would be present were a bank to act as an investment adviser to a closed-end investment company subject to the restrictions imposed by the Board. Those restrictions would prevent the bank from extending credit to the investment company and would also preclude the promotional pressures that are inherent in the investment banking business.[39] In addition to the fact that the bank could not underwrite or sell the stock of the closed-end investment company, that company, unlike a mutual fund, would not be constantly involved in the search for new capital to cover the redemption of other stock. The advisory fee earned by the bank would provide little incentive to the bank or its holding company to engage in promotional activities.[40]

---

for the purchase of stocks and might impair the ability of the commercial banker to render disinterested advice. 401 U. S., at 630–634.

[39] The bank could not stray from its obligation to render impartial advice to its customers by promoting the fund, because the interpretive ruling prohibits a bank from giving the names of its depositors to the investment company. 12 CFR § 225.125 (h) (1980); see n. 13, *supra*. Further, the bank could not act as investment adviser to any investment company having a similar name; prospectuses and sales literature of the investment company could not be distributed by the bank; officers and employees of the bank could not express an opinion with respect to the advisability of the purchase of securities of the investment company, and the investment company could not locate its offices in the same building as the bank. *Ibid.* These restrictions would prevent to a large extent the association in the public mind between the bank and the investment company, as well as the resulting connection between public confidence in the bank and the fortunes of the investment company. Although this association cannot be completely obliterated, we do note that the performance of the large trust funds operated by banks is routinely published. See American Banker, Sept. 2, 1980, pp. 1, 10, 16. The Securities Exchange Act of 1934 requires disclosure of information about the securities portfolios of common trust funds that have a portfolio with an aggregate value of at least $100 million. 15 U. S. C. § 78m (f); 17 CFR § 240.13f–1 (1980).

[40] The advisory fee is the adviser's consideration for managing the investment company. In 1962 the Wharton School Study of Mutual Funds indicated that the advisory fee charged by advisers to open-end funds

Our obligation to accord deference to the Board's interpretive ruling provides added support to our conclusion that the Board's regulation avoids the potential hazards involved in any association between a bank affiliate and a closed-end investment company. In *Camp* the Court emphasized that the Comptroller of the Currency had provided no guidance as to the effect of the Glass-Steagall Act on the proposed activity.[41] Whereas in *Camp* the Court was deprived of administrative "expertise that can enlighten and rationalize the search for the meaning and intent of Congress," 401 U. S., at 628, in this case the regulatory action by the Board recognized and addressed the concerns that led to the enactment of the Glass-Steagall Act. Contrary to respondent's argument, the *Camp* decision therefore affirmatively supports the Board's action in this case.

## IV

The Court of Appeals rested its conclusion that the Board had exceeded its statutory authority on a review of the legislative history of § 4 (c)(8). As originally enacted in 1956 the section referred to activities "closely related to the business of banking." In 1970, when the Act was amended to

---

was typically one-half of one percent of the value of the fund's assets. Wharton School Study, at 484. The amount of the advisory fee earned by the adviser to a closed-end company increases only if the value of the investment portfolio increases. In contrast, the fee of the adviser to a mutual fund increases both with the increase in value of the investment portfolio and through the sale of the company's shares. SEC Report of Special Study of Securities Markets, H. R. Doc. No. 95, 88th Cong., 1st Sess., pt. 4, pp. 204–205, 96–99 (1963). The fee paid by the closed-end company would provide scant incentive to a bank to risk its assets by making unwise loans to companies whose stock is held by the investment company.

[41] The Court stated:

"The difficulty here is that the Comptroller adopted no expressly articulated position at the administrative level as to the meaning and impact of the provisions of §§ 16 and 21 as they affect bank investment funds." 401 U. S., at 627.

extend its coverage to holding companies controlling just one bank, the words "business of" were deleted from § 4 (c)(8), thereby making the section refer merely to activities "closely related to banking." The conclusion of the Court of Appeals did not, however, place special reliance on this modest change. Rather, the Court of Appeals was persuaded that in 1956 Congress believed that the Glass-Steagall Act had been enacted in 1933 to "divorc[e] investment from commercial banking" and that the 1970 amendment to § 4 (c)(8) did not alter the intent expressed by the 1956 Congress. 196 U. S. App. D. C., at 110, 606 F. 2d, at 1017.

Congress did intend the Bank Holding Company Act to maintain and even to strengthen Glass-Steagall's restrictions on the relationship between commercial and investment banking. Part of the motivation underlying the requirement that bank holding companies divest themselves of nonbanking interests was the desire to provide a measure of regulation missing from the Glass-Steagall Act.[42] In 1956, the only provision of the Glass-Steagall Act which regulated bank holding companies was § 19 (e) of the Act, which provided that a bank holding company could not obtain a permit from the Federal Reserve Board entitling it to vote the shares of a bank subsidiary unless it agreed to divest itself within five years of any interest in a company formed for the purpose of, or "engaged principally" in, the issuance or underwriting of securities.[43] This provision was largely ineffectual, because

[42] 1955 Senate Report, at 2. See also H. R. Rep. No. 609, 84th Cong., 1st Sess., 16 (1955) (hereinafter 1955 House Report).

[43] Section 19 (e) provided in pertinent part:

"Every such holding company affiliate shall, in its application for such voting permit, (1) show that it does not own, control, or have any interest in, and is not participating in the management or direction of, any corporation, business trust, association, or other similar organization formed for the purpose of, or engaged principally in, the issue, flotation, underwriting, public sale, or distribution, at wholesale or retail or through syndicate participation, of stocks, bonds, debentures, notes, or other securities of any sort (hereinafter referred to as 'securities company'); (2) agree that

bank holding companies were not subject to the divestiture requirement as long as they did not vote their bank subsidiary shares.[44] Thus bank holding companies were able to avoid Glass-Steagall's general purpose of separating as completely as possible commercial from investment banking in a way not available to other bank affiliates or banks themselves. The inadequacy of § 19 (e) therefore lay not in the type of affiliation with securities-related firms permitted to bank holding companies but in the ability of holding companies to avoid any restrictions on affiliation by simply not voting their shares. To the extent that Congress strengthened the Glass-Steagall Act, it did so by closing this loophole rather than by imposing further restrictions on the permissible securities-related business of bank affiliates.[45] The clear evidence of a

during the period that the permit remains in force it will not acquire any ownership, control, or interest in any such securities company or participation in the management or direction thereof; (3) agree that if, at the time of filing the application for such permit, it owns, controls, or has an interest, in, or is participating in the management or direction of, any such securities company, it will, within five years after the filing of such application, divest itself of its ownership, control, and interest in such securities company and will cease participating in the management or direction thereof, and will not thereafter, during the period that the permit remains in force, acquire any further ownership, control, or interest in any such securities company or participate in the management or direction thereof . . . ." 48 Stat. 188.

The "engaged principally" standard is the same standard as is contained in § 20 of the Glass-Steagall Act. Section 19 (e) also required bank holding companies to divest themselves of shares of companies "formed for the purpose of" the issuance or underwriting of securities. We do not view this language as prohibiting securities-related activities that would not also be prohibited by the "engaged principally" standard. All companies formed for the purpose of issuing or underwriting securities would surely meet the "engaged principally" test.

[44] 1955 Senate Report, at 2; see S. Rep. No. 1179, 89th Cong., 2d Sess., 12 (1966) (hereinafter 1966 Senate Report).

[45] The Senate Report to the Bank Holding Company Act indicated that as of December 31, 1954, only 18 holding companies had obtained voting permits for bank shares from the Board. The Board estimated that 46

congressional purpose in 1956 to remedy the inadequacy of
§ 19 (e) of the 1933 Act does not support the conclusion that
Congress also intended § 4 (c)(8) to be read as totally pro-
hibiting bank holding companies from being "engaged" in any
securities-related activities; on the contrary it is more accu-
rately read as merely completing the job of severing the
connection between bank holding companies and affiliates
"principally engaged" in the securities business.[46]

To invalidate the Board's regulation, the Court of Appeals
had to assume that the activity of managing investments for
a customer had been regarded by Congress as an aspect of
investment banking rather than an aspect of commercial
banking. But the Congress that enacted the Glass-Steagall
Act did not take such an expansive view of investment bank-
ing.[47] Investment advisers and closed-end investment com-
panies are not "principally engaged" in the issuance or the
underwriting of securities within the meaning of the Glass-
Steagall Act, even if they are so engaged within the meaning
of §§ 16 and 21.[48] Nothing in the legislative history of the
Bank Holding Company Act persuades us that Congress in
1956 intended to effect a more complete separation between
commercial and investment banking than the separation that
the Glass-Steagall Act had achieved with respect to banks in
§§ 16 and 21 and had sought unsuccessfully to achieve with
respect to bank holding companies in § 19 (e).[49]

---

bank holding companies would be subjected to regulation by the Bank
Holding Company Act. 1955 Senate Report, at 2.

[46] As we have indicated previously, see n. 26, *supra,* the words "princi-
pally engaged," contained in both §§ 19 (e) and 20 of the Glass-Steagall
Act, the sections applicable to bank affiliates, indicate a significantly less
stringent test for determining the permissibility of securities-related ac-
tivity than does the word "engaged," contained in §§ 16 and 21, the
sections applicable to banks.

[47] See nn. 32, 33, *supra,* and accompanying text.

[48] See n. 26, *supra.*

[49] The 1966 Senate Report on the 1966 Amendments to the Bank Hold-
ing Company Act states that the purpose of the 1956 Act was in part to

A review of the 1970 Amendments to the Bank Holding Company Act only strengthens this conclusion.[50]  On its face the 1970 amendment to § 4 (c)(8) would appear to have

serve the "general purposes of the Glass-Steagall Act of 1933—to prevent unduly extensive connections between banking and other businesses."  1966 Senate Report, at 2.  The legislative history identified by the Court of Appeals merely indicates that Congress recognized the deficiency of § 19 (e), 1955 Senate Report, at 2, or·that Congress intended the Bank Holding Company Act to serve some of the same policies that we have identified as motivating the Glass-Steagall Congress:

"Whenever a holding company thus controls both banks and nonbanking businesses, it is apparent that the holding company's nonbanking businesses may thereby occupy a preferred position over that of their competitors in obtaining bank credit.  It is also apparent that in critical times the holding company which operates nonbanking businesses may be subjected to strong temptation to cause the banks which it controls to make loans to its nonbanking affiliates even though such loans may not at that time be entirely justified in the light of current banking standards.  In either situation the public interest becomes directly involved."  1955 House Report, at 16.

The Court of Appeals also cited legislative history indicating that the Board was to have a "limited" authority to administer the § 4 (c)(8) exception.  See Control and Regulation of Bank Holding Companies: Hearings on H. R. 2674 before the House Committee on Banking and Currency, 84th Cong., 1st Sess., 14 (1955); Control of Bank Holding Companies: Hearings on S. 880, S. 2350, and H. R. 6277 before a Subcommittee of the Senate Committee on Banking and Currency, 84th Cong., 1st Sess., 76 (1955). The fact that the scope of the Board's discretion was to be limited sheds no light on the question of Congress' view of the Glass-Steagall Act. Moreover, although the Court of Appeals relied, as indicative of congressional intent regarding the scope of § 4 (c)(8), on the Senate Report's omission of any securities-related activities from the listing of activities clearly falling within the § 4 (c)(8) exception, 196 U. S. App. D. C., at 110, 606 F. 2d, at 1017, the Senate Report, after listing those obviously related activities, goes on to indicate the importance of the Board's role in approving other such activities.  See 1955 Senate Report, at 13; n. 23, *supra.*  Finally, the Court of Appeals found significance in the repeal of § 19 (e) of Glass-Steagall in 1966 and the Senate Report's indication that § 19 (e) "serve[d] no substantial purpose" after passage of the 1956 Act. 1966 Senate Report, at 12.  At the same time as Congress repealed

broadened the Board's authority to determine when an activity is sufficiently related to banking to be permissible for a nonbanking subsidiary of a bank holding company.[51] The initial versions of both the House and the Senate bills changed the "closely related" test of § 4 (c)(8) to a "functionally related" test.[52] The Conference Committee's final version of the bill, however, retained the "closely related" language of the 1956 Act.[53] Whether this indicated that § 4 (c)(8) was to have the same scope as it did under the 1956 Act is difficult to discern.[54] For purposes of this case, however, we need

§ 19 (e), however, it amended the definition of "affiliate" in § 2 (b) of the Glass-Steagall Act to include bank holding companies, so that the restrictions applying to affiliates contained in § 20 of the Act then applied to bank holding companies as well. 80 Stat. 242. Furthermore, the fact that § 19 (e) served no purpose after the passage of the 1956 Act merely indicates that Congress was successful in its attempt to close the loophole left by Congress in the Glass-Steagall Act. It does not indicate that the 1956 Congress sought to impose more substantial restrictions than those contained in § 19 (e) or that the 1956 Congress misperceived the scope of those restrictions.

[50] See S. Rep. No. 91-1084, p. 4 (1970) (hereinafter 1970 Senate Report): "[T]he primary purpose of the pending legislation is to modify the Bank Holding Company Act of 1956 to bring under its provisions those companies controlling one bank . . . ." See also H. R. Rep. No. 91-387, p. 2 (1969) (hereinafter 1969 House Report).

[51] The 1956 version had required a close connection to the "business of banking." The 1970 Amendments required only a close connection to "banking." This change eliminated the requirement that bank holding companies show a close connection between a proposed activity and an activity in which the holding company or its subsidiary already actually engaged. Thus the 1970 amendment to § 4 (c)(8) permitted bank holding companies to engage in any activities closely related to activities generally engaged in by banks. H. R. Conf. Rep. No. 91-1747, p. 16 (1970) (hereinafter 1970 Conference Report); 116 Cong. Rec. 42436 (1970) (remarks of Sen. Bennett).

[52] 1969 House Report, at 1; 1970 Senate Report, at 25.

[53] 1970 Conference Report, at 5.

[54] The Conference Committee Report, signed by only four of the seven House conference managers, indicated that the "functionally related" test

not reconcile the conflicting views as to whether the 1970 amendment expanded the scope of § 4 (c)(8), because no one disputes that the Board's discretion is at least as broad under the 1970 Amendments as it was under the 1956 Act. Therefore, our conclusion that nothing in the 1956 Act or its legislative history indicates that Congress intended to prohibit bank holding companies from acting as investment advisers to closed-end investment companies should also apply to the 1970 Amendments unless Congress specifically indicated that such services should not be authorized by the Board. Not only is there no such specific evidence, there is affirmative evidence to the contrary.

The legislative history of the 1970 Amendments indicates that Congress did not intend the 1970 Amendments to have any effect on the prohibitions of the Glass-Steagall Act. The Senate chairman of the Conference Committee assured his fellow Senators that the conference bill was intended neither to enlarge nor to restrict the prohibitions contained

---

represented a "more liberal and expansive approach by the Federal Reserve Board in authorizing nonbank activities for bank holding companies" and that the retention of the "closely related" language indicated that "Congress was not convinced that such expansion and liberalization was justified." *Id.*, at 21. This view was not shared by all of the Senate Members of the Conference Committee, however. Senator Bennett criticized the Conference Report as an inaccurate indication of the conference's intent and expressed his belief that the conference intended to broaden the power of the Board to determine what activities are closely related to banking. 116 Cong. Rec. 42432–42437 (1970). Senator Bennett indicated that the proposed term "functionally related" was no broader than the retained term "closely related," and that the removal of the phrase "of a financial, fiduciary, or insurance nature" was intended to reflect an expansion of the Board's discretion. *Id.*, at 42432–42433. See also *id.*, at 42422 (remarks of Sen. Sparkman). See n. 2, *supra.* All of the Senators on the Conference Committee, however, did not so perceive the final version of § 4 (c)(8). Senator Proxmire indicated that "the conference committee agreed essentially to retain the standards of the existing 1956 Bank Holding Company Act." 116 Cong. Rec. 42427 (1970).

in the Glass-Steagall Act.[55]  Moreover, the Senate Report refers to investment services but declines to state that the Board could not approve under § 4 (c)(8) "bank sponsored mutual funds."[56]  The House's version of the bill rigidly

---

[55] During debate on the conference bill, Senator Williams expressed concern about the effect of the 1970 Amendments on the prohibitions of the Glass-Steagall Act:

"Mr. WILLIAMS of New Jersey.  I have one question I should like to ask the chairman of the committee.

"Both the Senate and House bills contained, in section 4 (c)(8), substantially similar language reiterating the existing law embodied in the Glass-Steagall Act which provides, essentially, for separation of commercial banking and the securities business.  This language does not appear in the bill agreed to by the conferees.  I wonder whether there was any intention to imply that the very securities-related activities forbidden to banks directly may nevertheless be engaged in by bank-holding companies or their nonbanking affiliates.

"Mr. SPARKMAN.  The answer to the Senator's question is that there clearly was not.  As it now stands, the Glass-Steagall Act broadly prohibits both banks and their affiliates from engaging in what we commonly understand to be the securities business.  There are some specific exceptions, of course, but I can assure you that we did not mean to enlarge or contract them here.  We regarded that general prohibition as being so clearly applicable to the subjects of this bill as to make a restatement of it unnecessary.  The provision to which you referred is already complicated enough.  In short, we did not intend to amend or modify, directly or indirectly, any limitations on the activities of banks, bank holding companies or any of their affiliates, now contained in the Glass-Steagall Act.  If Congress is to change that longstanding, fundamental statement of public policy, we will have to do so in other legislation.  I hope there is no longer any misconception on that point.

"Mr. WILLIAMS of New Jersey.  It is reassuring, indeed, to know that the Glass-Steagall Act has not been disturbed in any way and that there is no intention at all here to do so."  *Id.*, at 42430.

See also 1970 Senate Report, at 15.  By the time Congress was considering the 1970 Amendments, the definition of "affiliate" contained in § 2 (b) of the Glass-Steagall Act had been amended to include bank holding companies, so that the prohibitions contained in § 20 of Glass-Steagall had become applicable to bank holding companies.

[56] 1970 Senate Report, at 15.  The Report notes that the Senate version of the bill prohibited bank holding companies from holding shares in com-

confined the Board's discretion in certain areas by including a "laundry list" of activities which the Board could not approve. Included in this list was a prohibition of bank holding company acquisition of shares of any company engaged in "the issue, flotation, underwriting, public sale, or distribution," of securities, "whether or not any such interests are redeemable." [57] The Conference Committee deleted this list. This deletion indicates a rejection of the House's restrictive approach in favor of the Senate's more flexible attitude toward the Board's exercise of its discretion.[58] Thus

---

panies "engaged principally in the issue, flotation, underwriting, public sale, or distribution at wholesale or retail or through syndicate participation of stocks, bonds, debentures, notes or securities." The Report recognized that this provision was a restatement of the prohibition already contained in the Glass-Steagall Act. The Report goes on to state:

"The inclusion of this provision is not intended to prejudice the rights of banks or bank holding companies or their affiliates to engage in such of these activities as may be permitted under existing law or which may become permissible under this legislation or under any future legislation. In particular, the language is not intended to inhibit the underwriting of revenue bonds nor operating commingled or managing agency accounts (bank sponsored mutual funds) which activities have already been specifically approved in legislation previously reported by this committee and passed by the Senate, if such legislation is finally enacted, if these activities are allowed under the amendments being made by this legislation, or if the activities are permitted by the courts." *Ibid.*

When the 1970 Amendments were passed, the status of bank-sponsored mutual funds under the Glass-Steagall Act was unsettled. The District of Columbia Circuit's decision in *National Association of Securities Dealers* v. *SEC*, 136 U. S. App. D. C. 241, 420 F. 2d 83 (1969), approving bank operation of mutual funds, had not yet been reversed by our decision in *Investment Company Institute* v. *Camp*, 401 U. S. 617 (1971).

[57] 115 Cong. Rec. 33133 (1969).

[58] Senator Goodell stated that "[t]he Senate-passed bill . . . provided the banking industry with a great deal of flexibility regarding expansion into bank-related activities." 116 Cong. Rec. 42429 (1970). See n. 23, *supra*. As Senator Sparkman stated of the conference: "We reached a decision that the whole thing ought to be flexible, that it ought to be lodged in the hands of the Federal Reserve Board to carry out the guidelines we set." 116 Cong. Rec. 42429 (1970).

as we read the legislative history of the 1970 Amendments, Congress did not intend the Bank Holding Company Act to limit the Board's discretion to approve securities-related activity as closely related to banking beyond the prohibitions already contained in the Glass-Steagall Act.[59] This case is

[59] The Court of Appeals read the colloquy between Senators Williams and Sparkman, see n. 55, *supra,* as an indication that Congress was under the impression—admittedly incorrect—that the Glass-Steagall Act prohibited the services authorized by the Board here. 196 U. S. App. D. C., at 115, 606 F. 2d, at 1022. In light of the indications in the Senate Report that the Senate did not intend § 4 (c) (8) to foreclose the Board from approving bank-sponsored mutual funds, see n. 56, *supra,* and accompanying text, the Senate colloquy cited by the Court of Appeals lends scant support to the theory that Congress misunderstood the scope of the Glass-Steagall Act. Moreover, the language deleted from the Senate bill's version of § 4 (c) (8) to which Senators Sparkman and Williams were referring contained the "principally engaged" standard contained in § 20 of the Glass-Steagall Act, and not the more complete prohibition contained in §§ 16 and 21. See nn. 54, 55, *supra.* Furthermore, if Congress was confused about the scope of the Glass-Steagall Act, it may have believed that the statute permitted more than is actually the case. See n. 55, *supra.* Finally, given the flexible approach to § 4 (c) (8) which prevailed in the 1970 Amendments, we must presume that Congress did not intend to adopt a rigid and fixed construction of the Glass-Steagall Act but rather intended that the prevailing view of Glass-Steagall should guide the Board's discretion.

We also disagree with the Court of Appeals' conclusion that the policies underlying the 1970 Amendments would be frustrated by permitting bank holding companies to act as investment advisers to closed-end investment companies. See 196 U. S. App. D. C., at 116, 606 F. 2d, at 1023. The first policy, the fear that bank holding companies would improperly further the interests of the nonbanking subsidiary, is adequately protected by the Board's interpretive ruling. See nn. 38–44, *supra,* and accompanying text. Furthermore, given our conclusion that the 1970 Amendments at the very least did not cut back on the discretion granted the Board under the 1956 Act, we believe that to the extent that Congress addressed in the 1970 Amendments the second policy, the prevention of centralization of economic power, it did so by eliminating the one bank holding company loophole and not by limiting Board discretion to determine what activities are closely related to banking. 1970 Senate Report at 2–4; 1969 House Report, at 2.

therefore one that is best resolved by deferring to the Board's expertise in determining what activities are encompassed within the plain language of the statute.

Because we have concluded that the Board's decision to permit bank holding companies to act as investment advisers for closed-end investment companies is consistent with the language of the Bank Holding Company Act, and because such services are not prohibited by the Glass-Steagall Act, we hold that the amendment to Regulation Y does not exceed the Board's statutory authority. The judgment of the Court of Appeals is

*Reversed.*

JUSTICE STEWART and JUSTICE REHNQUIST took no part in the consideration or decision of this case. JUSTICE POWELL took no part in the decision of this case.